FIRST NATIONAL BANK OF CINCINNATI ET AL. *v.* FLERSHEM ET AL.*

Nos. 62 and 63. Argued November 9, 10, 1933.—Decided January 8, 1934.

---

* Together with No. 64, *Arzt et al.* v. *Flershem et al.,* and No. 65, *Clapier* v. *Flershem et al.,* certiorari to the Circuit Court of Appeals for the Third Circuit.

506

*Mr. Ralph Royall*, with whom *Mr. Sidney J. Watts* was on the brief, for First National Bank, petitioner in Nos. 62 and 63. *Mr. James F. Hubbell* for International Heater Co., petitioner in Nos. 62 and 63. *Mr. David M. Palley*, with whom *Messrs. Charles H. Sachs* and *Louis Caplan* were on the brief, for petitioners in Nos. 64 and 65.

*Mr. Lawrence Bennett*, with whom *Messrs. Maynard Teall* and *G. Franklin Ludington* were on the brief, for Flershem et al., respondents in Nos. 62, 63, 64, and 65. *Mr. Grandin Tracy Vought* for Bankers Trust Co., Trustee, respondent in Nos. 62, 63, and 64.

MR. JUSTICE BRANDEIS delivered the opinion of the Court.

These cases, which are here on certiorari to the Circuit Court of Appeals for the Third Circuit (289 U.S. 722), were argued together. They arise out of the Plan of Reorganization of the National Radiator Corporation of Delaware dated February 11, 1931. The Reorganization Committee sought to effectuate its Plan through securing, in a suit filed in the western district of Pennsylvania, the appointment of receivers and a judicial sale of the property. In that suit the federal jurisdiction was invoked on the ground of diversity of citizenship; the original plaintiffs being citizens of states other than Delaware and one of them a citizen of the district in which the suit was brought. The Corporation, a citizen of Delaware, was the sole defendant. The District Court appointed receivers, and entered decrees ordering the sale, confirming it, approving the Plan, and directing the receivers to convey and deliver to the purchaser the entire property. The Circuit Court of Appeals affirmed the decrees. 64 F. (2d) 847. The petitioners in No. 64 urge that the final decrees should be reversed as to them on the ground that the court lacked equity jurisdiction or that the bill lacked equity.

The petitioners in numbers 62 and 63 urge that the decrees should be reversed as to them mainly because the property was sold at a grossly inadequate price. The petitioner in No. 65 is the plaintiff in a bill of review, brought in the same court, praying that the order appointing receivers be vacated. Its dismissal, which was affirmed on appeal, is alleged to have been erroneous.

In August, 1927, National Radiator Corporation was organized to effect a merger of six independent manufacturers of radiators and boilers for heating purposes. The net assets of the consolidated corporation, which included ten manufacturing plants located in five states and warehouses in four others, were valued at $26,192,261.72. The capital was represented by 270,000 shares of no-par common stock; 60,000 shares of $7 cumulative convertible no-par preferred stock; and $12,000,000 twenty-year 6½ per cent sinking fund gold debentures. These had been underwritten, and were marketed, by J. &. W. Seligman & Co. and Bankers Trust Company of New York. The terms governing the issue of the debentures and the rights and remedies of the holders thereof were fixed by an indenture between the Corporation and the Bankers Trust Company, as trustee.

In January 1931, the management of the Corporation concluded, after months of consideration and conference with the bankers, that a revision of its capital structure was desirable in order to effect a drastic reduction of the debenture liability and the elimination of all fixed charges; and that, to this end, default should be made in the payment of the February 1, 1931 interest on the debentures. Before the merger, the constituent concerns had operated successfully for many years. After the merger the business ceased to prosper. By the end of 1931, all but three of the ten manufacturing plants had been closed; the outlook for the immediate future was

obscure; and there was no definite promise of an early recovery in earning power.[1]

A meeting of the Board of Directors was called for the purpose of taking formal action in respect to the payment of the February 1, 1931 interest. Although the Corporation had suffered (including depreciation and sinking fund charges) large losses in each of the years 1928, 1929 and 1930, its financial condition was still excellent. On December 31, 1930, the ratio of current assets to all current liabilities was more than 10 to 1; the current assets, including raw material and stock in process and manufactured, being $5,054,007.30. The ratio of cash on hand to all current liabilities was then 3½ to 1. It had $1,701,-899.94 cash and $1,132,563.17 in good accounts receivable; whereas its debts presently payable were only $46,787.60 (besides $293,339.58 for semi-annual interest accrued on the debentures but not payable until February 1, 1931, $151,768.54 of accrued taxes and like items, and $60,000 in notes payable in one, two and three years). The twenty-year debentures outstanding had been reduced from $12,000,000 to $10,716,000.[2]

After presenting to the Board the December 31, 1930, financial statement, the Chairman said:

" That, although the working capital of the Company as shown by the balance sheet was reasonably ample, it

---

[1] The Corporation acquired by the merger ten plants. Two at Johnstown, Pa.; two at New Castle, Pa.; one at Framingham, Mass.; one at Trenton, N.J.; one at Chicago, Ill.; and one each at Utica, Dunkirk, and North Tonawanda, N.Y. One plant had been sold in 1927 and one was shut down. Two were closed early in 1929. In 1930 one plant was shut down because of the decline in business, and one in 1931 before the receivers were appointed.

[2] On December 30, 1931, at which time Bankers Trust Company, trustee for the debenture holders, recovered judgment for the entire principal outstanding, the amount had been further reduced to $10,673,000.

was evident that, if the Company were to do an increasing volume of business, it would require the use of all or a substantial part of this cash to carry larger inventories and receivables, and that it would also be necessary to make large expenditures for the design of new products and for equipment necessary in their manufacture. Otherwise, the Chairman pointed out it might well prove to be impossible to maintain the Company's competitive business as against other enterprises in the industry. The Chairman then referred to the fact that the management had considered the advisability of a reorganization and had requested Messrs. Rudolph B. Flershem [the Chairman of its Executive Committee], Charles O. Cornell [a member of a firm specializing in reorganizations] and John H. Waters [the corporation's President] to act as a Committee to consider the matter and to formulate a Plan of Reorganization which might be submitted to the security holders of the Company. The Chairman reported that this Committee was now considering the matter of reorganization and had formed the opinion that a reorganization was advisable."

The recommendations of the management were adopted by the Board of Directors. It was voted to default in the payment of the February 1 interest; the holders of the debentures were notified that the default was deemed advisable in order to conserve the Corporation's cash resources; and, under date of February 11, 1931, an elaborate "Plan and Agreement of Reorganization" was submitted to the security holders for acceptance.

The Plan did not provide for raising additional capital. It was directed solely to reducing the liability on the debentures and eliminating all fixed charges. It provided that a new corporation be organized which would take over all the assets of the existing one, continue the business, and pay in cash all the current debts for merchandise and services; that the debenture indebtedness be

scaled by giving for each $1,000 of the 6½% twenty-year sinking fund debentures, $500 of the new corporation's 5% fifteen-year income debentures (without sinking fund provision),[3] 5 shares of its $7 preferred stock (entitled to $100 a share on involuntary liquidation and $115 a share on voluntary liquidation) and 20 shares of its common stock. Holders of the preferred stock in the existing company were to receive therefor, share for share, common stock in the new; and holders of the common stock of the existing company might (upon payment of $1), receive for every three shares a stock warrant, entitling the holder to purchase on or before July 1, 1941, one share of common stock in the new company upon payment of $20 per share. The Plan made no provision for dissenting debenture holders.

The Reorganization Committee proceeded to solicit deposits of securities under the Plan. Before September 15, 1931, it had secured the deposit of about 81 per cent. of the debentures and a large part of the preferred and common stocks. On that day it declared the Plan operative. On the same day it made a settlement with an opposing bondholders' protective committee,[4] whereby it secured additional deposits of about 9 per cent. of the debentures. Later, other deposits were received; so that ultimately more than 95 per cent. of all outstanding debentures were deposited under the Plan.

Some holders of non-assenting debentures demanded payment of their overdue coupons, including those for the

---

[3] Moreover, the existing debentures were entitled to be secured by a prior lien against any subsequent mortgage; the new debentures were entitled only to an equal lien with any subsequent mortgage. The Committee later agreed with an opposition committee (see note 4) that the lien should be prior.

[4] The opposition committee were to receive $35,000 for fees and expenses of the members and counsel; and one of its members, to be designated by the Reorganization Committee, was to become a member of the latter and of the board of directors of the new company.

August 1, 1931 interest. When payment was refused, the holders of $24,000 of the debentures brought an action therefor; and counsel gave notice of intention to bring a further action on coupons attached to others. In order to frustrate these attempts to collect the interest, and in order to compel the minority debenture holders to acquiesce in the Plan of Reorganization, the Committee commenced, on October 5, 1931, this suit praying for the appointment of receivers with power to continue the business; for a sale of the properties as an entirety; and that meanwhile all creditors be enjoined from enforcing their claims. The bill set forth the existing capital structure, the defaults in the payment of interest, and the Plan of Reorganization. It did not allege that the corporation was unable to pay the interest; or that it was insolvent; or that its assets while ample were not then available for payment of its debts. The bill alleged merely that:

"The defendant has no means at hand with which to meet, pay or satisfy the interest charges on the Debentures overdue as aforesaid without seriously jeopardizing the ability of the defendant to continue its business and without making it difficult or impossible for the defendant to secure necessary supplies, materials and labor to continue the operation of its plants and the sale of its products."

"[That] certain holders of the debentures not deposited with the complainants have threatened to bring suits in respect of interest due on their coupons and may levy execution upon the property of the defendant." . . . "[That] unless this Court will take jurisdiction in this cause for the protection of every interest in the property and assets of the defendant, the result will be a multiplicity of suits, a race of diligence, wasteful strife and controversy;" and dismemberment of the properties [and that] "It is to the best interests of the defendant and the complainants and other creditors of the defendant that

the going concern value of the defendant's business and properties should be maintained," etc.

On October 9, 1931, the Corporation entered its appearance; filed an answer admitting the truth of the allegations contained in the bill; joined in the prayers thereof; and consented to the appointment of receivers. On the same day receivers were appointed with power to continue the business; and creditors were restrained from enforcing their claims against the property. One of the receivers was Robert S. Waters, a Vice-President and General Manager of the Corporation and the son of John H. Waters, its President, Chairman of its Board of Directors and member of the Reorganization Committee. The other receiver was William G. Heiner, a Pittsburgh lawyer. With like consent, ancillary receivers were appointed in ten other jurisdictions in which the Corporation had property; and also in Delaware where it had none.

When the bill was filed, and when the receivers were appointed, the Corporation could have paid from the cash on hand all overdue debenture interest, as well as all its other current liabilities, without impairing its ability to continue the business. The cash on hand was $1,257,381.59.[5] The overdue interest amounted then to $709,395.69.[6] That $547,985.90, the difference between these two amounts, was more than the amount required for working capital is demonstrated by action of the receivers. Two weeks after their appointment, they applied

---

[5] On the day of their appointment, the receivers had also $1,494,327.22 in sound receivables and at least $34,534.40 in securities convertible in cash.

[6] The aggregate of other current liabilities (including amounts not then payable) was only $157,511.89. There was besides the August 1, 1931 requirement for the sinking fund. But the debentures held by the Corporation applicable for this purpose reduced the requirement of cash to $43,918.50.

for and obtained from the court leave to invest "such amount or amounts of cash of the receivership estate as in the judgment of the receivers is not needed at the time for expenses and working capital." Thereupon, they invested $1,030,000 of the cash in United States treasury certificates of indebtedness and in bank certificates of deposit.

The Bankers Trust Company, as trustee for the debenture holders, coöperated in all respects with the Reorganization Committee; served as depositary under the Plan; made formal demand for payment of the overdue interest; and brought, with leave of court, suit for the amount of the overdue interest on all outstanding debentures and recovered judgment therefor; thereupon declared the principal of the debentures immediately payable; recovered judgment therefor on December 30, 1931; and then intervened in the receivership suit as plaintiff.

In due course, application was made for an order of sale. The District Court did not make an appraisal by independent experts. In fixing the upset price and in confirming the sale, it relied practically upon the evidence given, or introduced, by officers of the Corporation and the members of the Reorganization Committee. On May 31, 1932, the decree ordering a sale was entered; the upset price was fixed at $2,500,000; and a date after the sale was set for a hearing on its confirmation and on the fairness of the Plan. An appeal from this decree was taken forthwith. At the sale, held August 8, 1932, the property was purchased in behalf of the Committee for $2,550,000 cash. The purchasers assigned their rights to the new company, National Radiator Corporation of Maryland, which agreed to enter an appearance in this cause; and upon the petition of the purchasers and the new company, a decree was entered finding the Plan fair; confirming the sale; and directing that the property be transferred to the new Corporation free and clear of all obligations to creditors of

the old. Thereupon, the assets were conveyed to the new company, over the objection of some of the petitioners that the appeal already filed rendered the court powerless to take or approve further action. The same counsel acted for the Reorganization Committee, the receivers and the new company.

While all the petitioners refused assent to the Plan and all appealed to the Circuit Court of Appeals from action of the District Court, the differences in their several positions and contentions are such as to require separate consideration of their legal rights.

*First.* Amy Arzt and Josephine Ramsey, the petitioners in No. 64, hold $121,000 of the debentures. They appeared specially at the hearing on the confirmation of the sale; objected, among other things, on the ground that the court lacked equity jurisdiction of the subject matter; appealed to the Circuit Court of Appeals from the decree affirming the sale; and contended there and here that, since they refused assent to the Plan, the decree should, as to them, be declared void, and reversed. Whether strictly there was lack of equity jurisdiction, we need not decide. Compare *Burnrite Coal Co.* v. *Riggs,* 274 U.S. 208; *Lion Bldg. & Surety Co.* v. *Karatz,* 262 U.S. 640; *Pusey & Jones Co.* v. *Hanssen,* 261 U.S. 491. For the suit is clearly without equity. The court's power was invoked for a purpose for which it may not be exercised.

We have no occasion to consider under what circumstances a court of equity may, through appointment of receivers and judicial sale, lend aid to protect the interests of creditors and effect a reorganization of an insolvent corporation.[7] Nor need we consider under what circum-

---

[7] All the cases in which this Court appears to have exercised this power in aid of reorganization upon the ground of insolvency dealt with railroads or other public utilities where continued operation of the property and preservation of its unity seemed to be required in the public interest. *Milwaukee & Minnesota R. Co.* v. *Soutter,* 2

stances a court of equity may, because the assets of a corporation are ample to meet all liabilities but cannot then be immediately converted into cash, properly appoint receivers in order to preserve values and prevent unequal treatment of creditors.[8] The case before us is of a different character. The possibility of insolvency was not mentioned when the board of directors voted to make default in the payment of the semi-annual interest on its funded indebtedness and approved the Plan of Reorganization. While defaulting on its debentures, the Corporation continued its business operations and paid promptly its merchandise and other unfunded indebted-

---

Wall. 510; *Davis* v. *Gray*, 16 Wall. 203; *Union Trust Co.* v. *Illinois Midland Ry.*, 117 U.S. 434; *Wallace* v. *Loomis*, 97 U.S. 146; *Wood* v. *Guarantee Trust Co.*, 128 U.S. 416; *Quincy, Missouri & Pacific Ry. Co.* v. *Humphreys*, 145 U.S. 82; *Louisville Trust Co.* v. *Louisville, N. A. & C. Ry. Co.*, 174 U.S. 674; *Re Metropolitan Ry. Receivership*, 208 U.S. 90; *Kansas City Terminal Ry. Co.* v. *Central Union Trust Co.*, 271 U.S. 445; compare *Sage* v. *Central R. Co.*, 99 U.S. 334; *Shaw* v. *Railroad Co.*, 100 U.S. 605. Moreover, in all those cases the sale was made upon foreclosure. In *Brown* v. *Lake Superior Iron Co.*, 134 U.S. 530, and *Leadville Coal Co.* v. *McCreery*, 141 U.S. 475, where the defendant corporation had allowed the receivership of a rolling mill to proceed nine months without answering and creditors did not object until after the decree of sale, this Court refused to decide whether originally the suit should have been allowed to proceed.

The Act of March 3, 1933, c. 204, § 77, 47 Stat. 1474, amending the Bankruptcy Act, provides: " Reorganization of railroads engaged in interstate commerce. (a) Any railroad corporation may file a petition stating that the railroad corporation is insolvent or unable to meet its debts as they mature and that it desires to effect a plan of reorganization."

[8] In *National Surety Co.* v. *Coriell*, 289 U.S. 426, 435, the question before this Court was not the equity of the bill, but the propriety of the procedure pursued by the District Court when approving the plan of reorganization. Compare *Michigan* v. *Michigan Trust Co.*, 286 U.S. 334, 343; *Shapiro* v. *Wilgus*, 287 U.S. 348, 356. *Filene's Sons Co.* v. *Weed*, 245 U.S. 597; *Riehle* v. *Margolies*, 279 U.S. 218; *Munroe* v. *Raphael*, 288 U.S. 485.

ness. Insolvency was not present, or imminent. The debentures were not to mature until 1947. Insolvency even in the remote future was not certain. This company defaulted when it was both solvent and liquid. It defaulted, although it had cash in bank equal to three and a half times its total current liabilities, including this interest. It defaulted, although the amount of the cash on hand was so large that, even if the interest had been paid, the surplus of cash remaining would have been more than was then required for working capital.

This deliberate disregard by the Corporation of the legal rights of the debenture holders is sought to be justified on the ground that the management, looking to the long future, concluded that the course taken would enure to the benefit of the business and all concerned—would benefit bondholders as well as stockholders. The default was the first step in a proposed revision of the capital structure by which the funded indebtedness would be cut in half and all fixed charges eliminated. The management, whose competency had been challenged, functioned as members of the Reorganization Committee. Having failed to obtain the assent of all the security holders to its Plan, the Committee sought the aid of a court of equity to compel the minority's acquiescence; and the Corporation joined as defendant in the prayers of the bill. Reorganization was the primary relief sought. The appointment of the receivers and the judicial sale were the device employed to effect a transfer of the assets of the existing corporation to a new one, thereby relieving both from the payment of the former's debts.[9] By these means

---

[9] Unless all debenture holders assented to the Plan, it could not be effectuated except through the medium of a judicial sale. For the indenture with the Bankers Trust Company, trustee, provided that the property of the Radiator Corporation should not be sold as an entirety unless " as a part of the purchase price for the sale of the property of the company as an entirety [the purchaser] expressly

it was hoped to subject all dissenting creditors to the condition of impotency so frequently occupied by minority stockholders.

The substantive law affords no warrant for so abridging the rights of individual creditors. There is no contention that the corporation laws of Delaware conferred such power upon the board of directors and the majority of the debenture holders. The purpose of the transaction was to hinder and delay certain creditors. If, acting upon purported authorizations from the board of directors and all stockholders, the Radiator Corporation had sought to achieve the purpose of the Reorganization Committee by a voluntary transfer of all of the assets to a new corporation, the conveyance would have been fraudulent in law as to dissenting debenture holders. It would have been a fraudulent conveyance even if the transaction had been entered upon solely in the interest of the debenture holders, in a well-founded belief that it would prove to their advantage, and although full payment of the indebtedness had been contemplated. *Means* v. *Dowd*, 128 U.S. 273.[10] The illegality would not have been avoided by coupling the transfer later with the appointment of a receiver. *Shapiro* v. *Wilgus*, 287 U.S. 348, 354–5. Nor could the illegality be avoided by first securing the appointment of

assumes in writing the due and punctual payment of the principal and interest of all the debentures;" whereas the main purpose of the Plan was to cut in half the amount of the debenture liability and to eliminate all fixed charges through transferring the entire property to a new company.

[10] Similarly, it has been held that an assignment made for the benefit of creditors, by one who is solvent, to avoid temporary embarrassment and sacrifice of assets, is a fraudulent conveyance as to those who have not consented; and that the conveyance will be set aside to the extent necessary to permit non-assenting creditors to levy execution. *Burt* v. *McKinstry*, 4 Minn. 204; *Gardner* v. *Commercial Nat. Bank*, 95 Ill. 298.

receivers and then effecting the transfer through a receivers' sale. Since the purpose was fraudulent in law, the rights of the non-assenting creditors cannot be impaired by the Corporation's admission of the self-serving allegations of the bill. Compare *Harkins* v. *Brundage,* 276 U.S. 36.

The power of the District Court was invoked, not to enforce rights of creditors, but to defeat them. The fact that the means employed to effect the fraudulent conveyance was the judgment of a court and not a voluntary transfer does not remove the taint of illegality.[11] *Jackson* v. *Ludeling,* 21 Wall. 616; compare *James* v. *Railroad Co.,* 6 Wall. 752; *Northern Pacific Ry. Co.* v. *Boyd,* 228 U.S. 482, 507. Nor is it material that the Corporation became insolvent later, long before entry of the order of sale, and that, but for the appointment of receivers, some non-assenting debenture holders would have obtained a preference. The lack of equity in the bill when filed is not cured by the insolvency later occurring. Compare *Pusey & Jones Co.* v. *Hanssen,* 261 U.S. 491. Moreover the insolvency which supervened was precipitated by the Reorganization Committee, then the only plaintiffs in this suit. It was at their request that the Bankers Trust Company, as trustee, declared the principal of the debentures due; recovered judgment thereon for $10,673,000; and inter-

---

[11] "An execution sale under a consent judgment, where the consent is, in effect, not the act of the defendant, but that of the plaintiff prosecuting the action, is in reality merely a voluntary transfer. To give it any better standing would be the grossest sacrifice of substance to form." *Title Ins. & Trust Co.* v. *California Development Co.,* 171 Cal. 173, 210; 152 Pac. 542, 558. See also, *Metcalf* v. *Moses,* 35 App. Div. 596, 55 N.Y.S. 179; 161 N.Y. 587, 56 N.E. 67; *Mechanics Bank* v. *Burnet,* 33 N.J.Eq. 486; *Atwater* v. *American Exchange Bank,* 152 Ill. 605; 38 N.E. 1017; *Skinner* v. *Case Threshing Machine Co.,* 94 Ind. App. 651; 182 N.E. 99; *Hill* v. *Pioneer Lumber Co.,* 113 N.C. 173; 18 S.E. 107.

vened as party plaintiff. These acts were steps in carrying out the Plan in which the Corporation, the Committee and the Trust Company coöperated.

The sale and reorganization being in law fraudulent as to the petitioners in No. 64, it remains to consider the relief to which they are entitled. If, as in *Shapiro* v. *Wilgus,* 287 U.S. 348, 357, the reorganization had been effected by a voluntary transfer and thereafter receivers had been appointed by the federal court, these creditors would, upon recovery of judgment, have been " entitled to an order in the alternative either for the payment of the judgment out of the assets in the hands of the receivers or in default thereof for leave to issue execution." The relief and the procedure should be the same here, although these petitioners are not judgment creditors, and the transfer followed the appointment of receivers. They should be paid in full upon establishing their claims in this case, because they were prevented by the interlocutory order appointing receivers from proceeding against the assets, fraudulently transferred, and thereby securing a lien, which would have yielded them full payment. Compare *Metcalf* v. *Barker,* 187 U.S. 165, 174; *Freedman's Savings & T. Co.* v. *Earle,* 110 U.S. 710; *Chittenden* v. *Brewster,* 2 Wall. 191.[12]

Nothing in the indenture with the Bankers Trust Company, or in its action as trustee thereunder, interferes with affording them this relief. That instrument expressly reserves to the individual debenture holders the right to collect interest and principal in an action at law. If that right was impaired by the acts of the Trust Company, in declaring the principal of the debentures due and securing judgment thereon, equity will grant relief; because those acts, done at the request of the Reorganization Com-

---

[12] See also *Metcalf* v. *Moses,* 35 App. Div. 596, 55 N.Y.S. 179; 161 N.Y. 587, 56 N.E. 67; *Johnston* v. *Straus,* 26 Fed. 57.

mittee, were incidents of the Plan which we hold was fraudulent in law as to these petitioners.[13] The debenture holders who, by assenting to the Plan, coöperated with the Corporation and the Reorganization Committee, are in no position to complain that these petitioners will fare better than they. Compare *Davis* v. *Virginia Ry. & Power Co.*, 229 Fed 633, 642.[14] Since the assets fraudulently conveyed far exceed the amount of the claims of all non-assenting creditors, none of these could have occasion to object to the payment to these petitioners in full.

*Second.* Lily Clapier, the petitioner in No. 65, is the holder of $11,000 of the debentures. She refused to assent to the Plan of Reorganization, but did not seek to intervene in the receivership suit. Instead, she brought in the

---

[13] The record does not show that all the debentures would not have been paid in due course under proper management, in the absence of the voluntary default made to effect the desired reorganization—and other proceedings to that end.

[14] There, in a case of reorganization, the Court said: " The holders of the bonds secured by the senior mortgages and the other debenture bondholders of the Richmond Company had the opportunity to join the petitioner in his effort to recover property which he alleged had been taken from that on which they all relied for security. They refused to enter the contest, and accepted as full payment and satisfaction of their bonds the settlement offered in the reorganization. Thus the petitioner was left as the only bondholder who chose to avail himself of the reservation and make the contest, and it follows that he alone is entitled to receive the fruit of his effort. . . . All other creditors waived their rights, and were in the position of saying, either that there was no merit in petitioner's contention, or that they were unwilling to make any effort to bring under the security the property alleged to have been diverted. Evidently, under such conditions, the property which may be recovered or brought back as a part of the assets of the Richmond Company by petitioner's efforts and expense would be applicable to his bonds. The principle is well settled by authority. *Freedman's S. & T. Co.* v. *Earle,* 110 U.S. 710." See, also, *In re American Candy Mfg. Co.,* 256 Fed. 87, 88; *George* v. *St. Louis Cable & Western Ry. Co.,* 44 Fed. 117, 120–124.

same court, a separate suit against the Corporation and the receivers in the nature of a bill of review. Suing on behalf of herself and all other creditors who had refused to accept the Plan, she charged that the court was without jurisdiction in equity to appoint receivers; and prayed that the decree appointing them be vacated and no further proceedings be had. The receivers and the Corporation moved to dismiss the Clapier suit on the ground that the bill failed to set forth a cause of action. These motions were granted, without passing upon the question whether in view of the fact that two of the defendants were citizens of the same State as the plaintiff, there was lack of federal jurisdiction. From the decree of dismissal she appealed to the Circuit Court of Appeals.

"A bill of review is called for only after a final decree— one that finally adjudicates upon the entire merits, leaving nothing further to be done except the execution of it." *John Simmons Co.* v. *Grier Bros. Co.,* 258 U.S. 82, 88. For this reason, a bill of review will not lie to review an interlocutory order appointing a receiver. The dismissal of the Clapier suit was, therefore, proper. But that decree should have been without prejudice to her right to prosecute her claim against the Corporation, the assets in the hands of the receivers and the new company. To this end she should be given leave to intervene in the receivership suit and there present her claim for such relief as may appear to be appropriate. As the new corporation became party to the suit when it applied for confirmation of the sale, there is here no obstacle to this procedure. Compare *National Surety Co.* v. *Coriell,* 289 U.S. 426, 438; *Kneeland* v. *American Loan Co.,* 136 U.S. 89.

*Third.* The First National Bank, one of the two petitioners in Nos. 62 and 63, is the holder of $68,000 of the debentures. It filed, before the hearing on ordering the sale, a petition for leave to intervene; and was permitted

to do so as party defendant, but only " in subordination to and recognition of the propriety of the main proceeding." In the hearings on ordering the sale, on approving the Plan, and on confirming the sale, it took part by cross-examination of witnesses and by argument; but it did not introduce any evidence. It appealed from both the interlocutory and the final decree.

The Bank does not claim that the District Court was without equity jurisdiction or that the bill lacked equity. It concedes that the court could properly lend its aid to effectuate the proposed reorganization and, to this end, might sell the assets as an entirety. Its contention is that the property held in receivership was a trust fund to be administered for the benefit of each and every creditor, and since some of the debenture holders had refused to assent to the Plan of Reorganization, the court was under the duty to make the sale on such terms and under such conditions as would ensure to them, as their distributive share of the assets, the largest amount in cash which could be realized therefrom; and that the court, basing its action upon estimates offered in support of the Plan, fixed a grossly inadequate upset price and erred in confirming the sale. The respondents insist that the non-assenting debenture holders were entitled only to their distributive share of the sum for which the property could have been sold if scrapped; and that they would, under the price paid, receive that much.

It is clear from the evidence introduced by the Reorganization Committee and the receivers that the upset price and the sale price were far below even the scrap value. The upset price fixed was $2,500,000. The entire property was sold to the Reorganization Committee for $2,550,000. At that time the cash and assets equivalent to cash alone aggregated $2,192,804.95. There was cash $1,551,615.78; and notes and accounts receivable (after deducting ample reserve for doubtful accounts) $641,-

189.17. Besides, there were $1,671,605.91 in raw material, goods in process and manufactured; bonds, stocks and like items valued at $88,873.41; manufacturing plants, and the warehouses in the several cities theretofore valued at $6,388,318.83; goodwill, trade marks and patents theretofore valued at $6,634,501.90; and other assets valued at $166,475.65. Moreover, the existence of the Plan of Reorganization, assented to by a vast majority of the security holders, gave assurance of at least one bidder for the entire property who had confidence that the business, if sold as an entirety as a going concern, possessed a value greater than its liquidating value; and would, if necessary to effectuate the Plan, bid for the assets in cash more than the estimated liquidating value. The upset price and the sale price were grossly inadequate.[15]

---

[15] It seems to have been the aim of the Reorganization Committee to have the upset price fixed at a sum which would yield to non-assenting debenture holders not more than the then market value of their bonds. At one time it had made at one of its meetings a tentative suggestion of $3,600,000. The gross inadequacy of the upset price is illustrated by the division of the $2,500,000, as applied to the ten separate parcels in which, as a formality, the property was offered before selling it as an entirety to the Reorganization Committee. Parcel A for which the upset price of $2,392,000 was set included, besides the plants and other real estate in Pennsylvania, all the personal property except that used in connection with the plants and other real estate located in the other eight States. Parcel B embraced the plant and appurtenant real and personal property in New Jersey (including 11½ acres near Trenton and 14 dwelling houses), carried on the books at $861,179.12. The upset price on this parcel was fixed at $28,000. Parcel C embraced the plant and appurtenant real and personal property in Massachusetts (including 23 acres at Framingham), carried on the books at $592,452.64. The upset price for this parcel was fixed at $17,500. Parcel D embraced the plant and appurtenant real and personal property at North Tonawanda (including 10 acres) and Dunkirk, New York, valued on the books at $1,318,373.60. The upset price for this parcel was fixed at $37,500. Parcel E included 10 acres of land, the plants and appurtenant real and personal

In justifying the action taken, the Court of Appeals called attention to the fact that the non-assenting creditors had not introduced any evidence to prove their contention that the sale should not be confirmed. In view of the undisputed facts stated above, the introduction of such evidence was not indispensable. The failure to secure an adequate price seems to have been due, not to lack of opposing evidence, but to the mistaken belief that it was the duty of the court to aid in effectuating the Plan of Reorganization, since a very large majority of the debenture holders had assented to it. Moreover, the court stood in a position different from that which it occupies in ordinary litigation, where issues are to be determined solely upon such evidence as the contending parties choose to introduce. In receivership proceedings, as was held in *National Surety Co.* v. *Coriell,* 289 U.S. 426, 436, every important determination by the court calls for an informed, independent judgment; and special reasons exist for requiring adequate, trustworthy information where the jurisdiction rests wholly upon the consent of the defendant who joins in the prayers for relief. It would be

property and a warehouse at Chicago, Illinois, carried on the books at $605,149.43; and also the Edgewood Apartment Hotel, at Chicago, carried on the books at $51,172.31. The upset price fixed for this parcel was $17,500. Parcel F included the warehouse at Baltimore, Maryland, and the usual equipment, which was carried on the books at $33,477.93. The upset price on this parcel was fixed at $1,000. Parcel G included the warehouse equipment at Cincinnati, Ohio, which was carried on the books at $48,632.84. The upset price on this parcel was fixed at $2,250. Parcel H included the warehouse at Richmond, Virginia, which was carried on the books at $26,045.42. The upset price on this parcel was fixed at $1,000. Parcel I included two warehouses at Hempstead, New York, which was carried on the books at $30,093.81. The upset price on this parcel was fixed at $1,000. Parcel J included the warehouse at Washington, D.C., which was carried on the books at $58,536.53. The upset price on this parcel was fixed at $1,000.

unreasonable to impose upon a few dissenting creditors the heavy financial burden of making an adequate appraisal supported by the testimony of competent experts, where, as here, the assets include extensive plants and equipment located in nine states.

The relief which the Bank seeks is that sum in cash which it would have received if the property had been sold at a proper price. To this relief it is clearly entitled. The cause is remanded to the District Court for the purpose of ascertaining the sum. In making the determination it must be borne in mind that the problem which was presented to the trial court upon the application for the receivers' sale of the assets of this manufacturing company, with its many far flung plants and warehouses, was a very different one from that with which courts have been confronted upon applications for sale on foreclosure of railroad systems. In such cases, it is ordinarily necessary that the property be sold as an entirety. The unity of the system must be preserved in both the public and the private interest, and the large amount of cash required by the upset price renders the Reorganization Committee, which ordinarily controls a large majority of the outstanding securities, practically the only bidder.[16] Compare *Kansas City Terminal Ry. Co. v. Central Union Trust*

---

[16] By the decree the purchaser was required to pay only $300,000 in cash, presumably to cover the expenses and fees of the Reorganization Committee, the receivers and counsel. The decree provided that on the balance of the purchase price: " The Purchaser shall be credited on account of his purchase price for Debentures and coupons and assigned claims finally established and allowed, turned over in part payment of the purchase price, with such sum as would be paid in respect of such Debentures, coupons and assigned claims out of the proceeds of sale, if the whole amount of the purchase price had been paid in cash." By this provision, customary in decrees for sales of railroad systems on foreclosure, the Reorganization Committee was relieved of the necessity of raising a large sum in cash—a necessity which naturally would deter bidders not so situated.

*Co.*, 271 U.S. 445, 453–4. In the case at bar, preservation of the unity of the property was not essential. The sale of the assets in many parcels was possible; and perhaps desirable in the interest of all concerned.

A detailed appraisal must now be made of the Corporation's assets as of the date of the sale, based upon then values and the possibility of disposing of them in parcels, as well as an entirety. The appraisal of the current assets will present little difficulty. And the experience gained since the sale in collecting the receivables and in disposing of the inventory will be of aid. The appraisal of the property other than the current assets will require careful preparation and consideration. The inadequacy of the upset price seems to have resulted mainly from the assumption that the only alternatives were to continue to operate the properties as an entirety or to scrap all; and from a determination that the properties should not be scrapped. So far as appears, no consideration was then given to the possibility of selling the properties in such parcels as would permit of reconstituting as separate units some of the original independent concerns; or to the fact that a detailed valuation of the many items of which the assets, tangible and intangible, were composed was essential to intelligent bidding for the property in such parcels or as scrap; or to the fact that if the sale was not made as an entirety the appropriate markets for some of the parcels or lots might not be New Castle, Pennsylvania, where the sale was held. Moreover, no attempt appears to have been made then to secure bids from buyers of scrapped properties.

The history of the enterprise lends no support to the view that unless all the property was to be scrapped, all had to be sold as an entirety. The losses of the Corporation appear to have been due largely to the fundamental mistake of judgment committed in merging the several independent concerns. Before the consolidation each of

the six independent concerns earned large profits. Their aggregate profits for each of the last three years before the merger had averaged $3,455,642 a year. A few months after the merger the Corporation entered upon a period of heavy losses which continued unbroken up to the time of the receivers' sale. The abrupt change from profit to loss was not the result of the general business depression. Although 1928 and 1929 were years of general business prosperity,[17] the loss of the Corporation (before payment of debenture interest) was $587,123 in 1928; and $490,371 in 1929.[18] The heavy losses during 1928, 1929 and later years (including the period of the receivership) appear to have been due in large measure to the cost of carrying unused properties. During the receivership, only the Pennsylvania plants were in operation.[19] For them there was still substantial business; and that business might then have been profitable if not burdened with the cost of carrying the many unused properties.[20] In valuing the assets the appraisers should also bear in mind that, even if part of the properties should have been sold as scrap, the Reorganization Committee was a willing purchaser for the rest.

*Fourth.* The International Heater Company, the other petitioner in Nos. 62 and 63, holds three promissory notes of the Corporation of $20,000 each, maturing respectively

---

[17] The losses were, doubtless, due in part to the fact that already, at the end of 1927, the very lucrative "direct to the consumer" business theretofore carried on by two of the theretofore independent concerns had to be discontinued, because incompatible with the selling methods of the other plants of the consolidated company.

[18] The greater part of the products of these plants was used in the new buildings. In the year 1928, the new construction in America was said to have reached its all-time record.

[19] See note 1, *supra.*

[20] During the first four months of the receivership the gross sales were $1,300,000. For the first fifty days of the receivership an operating gain of $31,917.77 was turned into a loss of $14,630.44 by reason of maintenance expense of the non-operating plants of $46,548.21.

on the last days of 1931, 1932 and 1933. It refused assent
to the Plan; but it does not question either that the District
Court had equity jurisdiction of the cause, or that
there was equity in the bill. It expressly concedes that
the court could properly lend its aid to enable security
holders of an unsuccessful corporation to find, through reorganization,
a practical method of continuing the business.
Its main objection is that under the decree entered,
it is denied payment in cash of the amount to which it is
entitled. The Heater Company did not learn of the application
for the order of sale until after the hearing
thereon had closed. Then it filed a petition to intervene;
was permitted to intervene as defendant, but only "in
subordination to, and recognition of, the propriety of the
proceeding"; and it appealed to the Circuit Court of Appeals
from both the decree ordering the sale and from that
confirming it and approving the Plan. It seeks reversal
of the decree on two entirely distinct and alternative
grounds.

1. The Heater Company asks that, pursuant to the
Plan, these notes be paid in full by the new corporation.
The Plan provides that debts for merchandise or services
shall be paid by the new corporation in full. These notes
were part of the purchase price paid, in the latter part of
1927, for a minority interest in the stock of the Lincoln
Radiator Company, the majority interest of which the
Corporation had previously acquired. The Heater Company
contends that the notes, being a part of the current
indebtedness of the old company, and having been given
for personal property, are to be deemed merchandise debts
within the meaning of the Plan; but that, if the Plan
as drawn does not include them, it should be amended by
the court, so as to provide for the payment of the notes in
full. The Court of Appeals rejected this contention. We
think it was right, substantially for the reasons stated
by it.

2. The Heater Company contends that, if the notes are not to be paid in full, it should receive a sum much larger than its distributive share of the purchase price paid by the new corporation. Unlike the Bank, it does not argue that the court was obliged to make an independent investigation into the value of the assets before fixing the upset price. Its contentions are that the Heater Company should not be prejudiced by its own failure to introduce evidence on that issue since it had no notice or knowledge of the hearing; that, moreover, the gross inadequacy of the price paid was due to the fact that, instead of aiming to secure for non-assenting creditors the largest possible sum in cash, the court treated the receivers' sale as merely a necessary step in effectuating the Plan of Reorganization; and hence adopted a method of selling which excluded all bidders except the Reorganization Committee. We have no occasion to discuss this argument in detail. For the reasons stated in connection with the Bank's claim, we think that the sale was made at a grossly inadequate price; and that it was invalid also as to the Heater Company. Like the Bank, the Heater Company is entitled to receive in cash its distributive share of the amount which, upon the new appraisal, shall be found to have been the fair selling value of the assets.

*In Nos. 62, 63 and 64, decree reversed as to petitioners.*
*In No. 65, decree modified, and as modified affirmed.*