**FRIENDS FOR ALL CHILDREN, INC., as legal guardian and next friend of the named 150 infant individuals, et al., Plaintiff,**

v.

**LOCKHEED AIRCRAFT CORPORA-TION, Defendant and Third-Party Plaintiff,**

v.

**The UNITED STATES of America, Third-Party Defendant.**

Civ. A. No. 76–0544.

United States District Court, District of Columbia.

May 30, 1980.

Oren R. Lewis, Jr., Richard H. Jones, Lewis, Wilson, Lewis & Jones, Ltd., Arlington, Va., J. Vernon Patrick, Jr., Berkowitz, Lefkovits & Patrick, Birmingham, Ala., for plaintiff.

Carroll E. Dubuc, Washington, D. C., for defendant and third-party plaintiff Lockheed Aircraft Corp.

Mark Dombroff, James P. Piper, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for third-party defendant the United States of America.

## MEMORANDUM AND ORDER

OBERDORFER, District Judge.

### I.

#### A.

Trials of three of the 150 damage claims of surviving infant plaintiffs establish that some better procedure for scheduling these cases for trial and providing interim relief is urgently required. The medical evidence adduced thus far suggests that some of the 147 remaining cases should have a priority for trial while others should be deferred until the medical condition of the plaintiffs has developed with greater clarity than is now available. Moreover, in view of the extraordinary amount of time the trial of these remaining cases will consume, the plaintiffs may be entitled to interim relief (1) to determine objective criteria for establishing the priority of these cases for trial;

(2) to provide medical diagnostic care necessitated by the risks inherent in their exposure to the conditions of the crash; and (3) to provide medical treatment to obviate or mitigate the effects of injuries likely to have been caused by the crash. These remedies may be required by the inability or refusal of plaintiffs and defendant to make a realistic appraisal of the claims and defenses.

### B.

These 150 cases grow out of the April, 1975, crash near Saigon of a Lockheed-built United States Air Force C5–A transport plane carrying United States military and civilian personnel and 226 Vietnamese orphans. The claims by and on behalf of the orphans now before the Court and the estates of the 76 deceased ones were filed in this Court in 1975 and 1976 by Friends For All Children (FFAC), the Colorado charitable corporation which had cared for the children in Vietnam and arranged for their adoption and transportation out of that country as the war was ending. Plaintiffs have demanded jury trials.

One FFAC complaint, No. 76–0544, sought damages for injuries allegedly suffered by 150 surviving orphans. The other FFAC complaint, No. 75–0874, sought damages for the estates of the 76 deceased orphans. The Court appointed a guardian *ad litem* to represent the surviving orphans. In addition, the adoptive parents of 67 orphans have intervened to represent their wards and some parents have intervened on their own account. The persons serving as guardians have applied for and received letters of administration in two decedent cases.

After protracted pretrial litigation, including an interlocutory appeal, Lockheed and the United States agreed on September 14, 1979, not to contest Lockheed's liability to the surviving orphans for compensatory damages. In late 1979, the Court scheduled March 17 jury trials of damage actions brought on behalf of three infant survivors of the crash, and reserved time on its calendar for May, June, and July trials of other

damage claims which the parties could not settle amicably. The parties and the Court anticipated that trial of the first cases would set a standard for measuring damages suffered by all the infant plaintiffs, who in most cases complain of quite similar injuries. Thus, these trials were expected to obviate the necessity of trying the bulk of the claims of the remaining infant survivors. The Court further anticipated that as a result of the stipulation of liability, these first cases would be decided on the medical testimony of each side's experts who had examined the infants and formed opinions about the nature and extent of their injuries. The trial time set aside after the first three trials was expected to have been utilized for cases that varied from the norm.

In fact, trial of the first case, *Schneider v. Lockheed*, lasted nearly one month, much of which was consumed by a protracted contest over the circumstances of the crash itself. The jury returned a verdict for the plaintiff Schneider of $500,000. Trial of the second case, *Zimmerly v. Lockheed*, commenced immediately before the same jury. Despite the fact that much of the evidence in *Schneider* was incorporated into the record in *Zimmerly*, that trial lasted more than two weeks. Prior to submission of the case to the jury, the parties settled one element of plaintiff's claim for $30,000; thereafter, the jury returned a verdict for the defendant. After a week's recess, a trial of the third case, *Marchetti v. Lockheed*, began before the same jury (with two former alternates replacing two withdrawing jurors). That trial continued for nearly three weeks before the case was submitted to the jury.

### C.

On the basis of this substantial experience, I have come to four conclusions: *first*, early settlement of these claims is now unlikely.

*Second*, it will take a single judge six or more years to try all of these cases; even if the untried cases are now distributed among all the judges of the District Court, it would still be years before each of these actions is brought to trial.

*Third,* the three trials have made clear that all plaintiffs aboard the C–5A shared a traumatic experience involving explosive decompression at a high altitude, hypoxia, and crash. This shared experience corresponds to an unusually large number of symptoms of minimal brain dysfunction (MBD) in the 34 plaintiffs who have already been examined by specialists. The children were about one year of age at the time of the crash; they are now entering kindergarten or the first grade. MBD manifests fewer objective symptoms in children who are the age of plaintiffs than will be the case when they are eight-to-ten years old and confront the more formidible challenges of the third and fourth grades in school.

Experts for both parties agree that in three or four years most of those with permanent disability will be more easily diagnosed; those who have suffered no permanent disability can be identified more confidently. Thus, even defendant's experts who now find no objective signs of injury in particular children concede that these children may later manifest these symptoms; and even plaintiffs' experts, who are certain that particular plaintiffs suffered these latent injuries and now show initial signs of incapacity, cannot testify as confidently now as they will later about the degree to which these injuries will cause permanent disability. Even at the stage when these injuries "ripen," a plaintiff's needs for medical treatment and special educational services as a result of the crash may vary from month-to-month or year-to-year.

Fourth, the medical testimony has made it possible to decide now whether as a group plaintiffs presently require systematic diagnosis and observation to alert doctors to incipient manifestations of brain injury, and whether those who show signs of injury should have prompt medical and rehabilitative treatment to minimize or obviate the effects of the injury.

## D.

Unless some alternative procedure is developed promptly for the remaining 147 cases, some plaintiffs may win large verdicts and yet never develop the serious needs forecast for them by the jury. Where this happens, Lockheed stockholders and United States taxpayers will assume a burden which is essentially a wind-fall to the infant plaintiff, its family, and its counsel. Other plaintiffs who ultimately win verdicts may nevertheless have suffered irreparable injury before trial judgment makes funds available for medical treatment and special services; this may be too late to reverse or even moderate their conditions. Still others may be unable to persuade a jury to award compensation at the time of an early trial because their symptoms are too vague, have not been detected, or have not "ripened"; yet, some months or years thereafter these unsuccessful infant plaintiffs may suffer from the crash as much or more than others whose symptoms ripened earlier but abated or benefitted from prompt attention.

Those plaintiffs whose cases are brought to trial early may thus effectively be denied the opportunity to convince a jury that they suffered injuries from the crash. Conversely, those plaintiffs whose cases may not be tried for some years, either because of docket considerations or a decision by the Court or the parties to postpone trial until the symptoms "ripen," stand a far greater chance of obtaining a fair recovery. Yet this delay may deny plaintiffs the resources they need now to mitigate the effects of their injuries. Thus these plaintiffs are under enormous pressure to settle or try the cases swiftly in order to provide the means to obtain necessary medical and educational services.

A federal court is not required to countenance such inequity. I have said many times in conferences about this case that a long series of jury trials for damages may be too crude an instrument to achieve justice for all parties here. The plaintiffs' counsel obviously sought to win large verdicts in the early cases and from that high ground negotiate satisfactory settlements. Plaintiffs' counsel was apparently unsatis-

fied with the shock effect of the $500,000 verdict in the *Schneider* case, and in *Zimmerly* did not pursue vigorously the theory, embraced by the jury serving in both cases, that the crash aggravated a pre-existing condition—with obvious result. Plaintiffs' counsel now complains that the difference in verdicts makes settlement too difficult. In an apparent effort to avoid or minimize the consequences of its agreement not to contest liability (and to pay $5,000 to each qualifying plaintiff) in exchange for plaintiffs' abandonment of their punitive damage claims, defendant has deployed a formidible force of lawyers and experts and has vigorously contested almost every item of evidence and every point of law in a questionable attempt at defense by attrition. My efforts at simplifying the trial and encouraging settlement have been unsuccessful. Defendant has effectively interdicted settlement by denying its counsel authority to make an unconditional offer in the *Marchetti* case when it had been pretried and was ready for trial on the next business day.

The parties are now on a collision course which, unless corrected, and assuming each of the remaining 147 cases requires two weeks to try, will consume 294 trial weeks, or about six years. This stance of the parties confronts me with the option of either abandoning my responsibility for the scores of other cases on my docket and trying the 147 cases seriatim or scattering about 10 cases amongst each of my colleagues, who already have other heavy responsibilities of their own. Neither alternative would prevent irreparable injury to the plaintiffs, exposure of defendants to some unjustifiably large wind-fall verdicts, or dispatch efficiently the business of the Court.

These cases are not games, yet they are being played by some as if they were. The Court is not required to stand by and referee these games when it can resolve the impasse and prevent unjust wind-falls, irreparable injury, and serious congestion of the docket of this busy federal court. As Judges Will and Robson noted in their recent opinion regarding the Chicago DC-10 crash:

This Court's primary responsibility is to insure the fair, just, and speedy disposition of cases. Meeting this responsibility is an increasingly difficult task as new, unexpected problems arise and more complex and multifaceted cases face the courts. Courts frequently discover that traditional solutions to traditional problems do not always work when applied to unusual cases. Fortunately, our system is not static, but is adaptable to changing needs and extraordinary situations.

*In re Air Crash Disaster Near Chicago, Ill.*, 480 F.Supp. 1280, 1287 (N.D.Ill.1979); *see* Manual for Complex Litigation (1977).

## II.

### A.

█ To resolve this dilemma, I am inviting the parties to address a possible solution having these four principal elements: (1) a procedure to evaluate plaintiffs' medical conditions so that cases are brought to trial when their conditions permit accurate adjudication; (2) provision for diagnosis and observation of *all* plaintiffs for symptoms of brain injury; (3) provision during the period before trial for treatment of those plaintiffs who manifest signs of injury; and (4) establishment of a structure to encourage settlements by providing for the exchange of medical information and offers.

### B.

█ While the defendants have in each case contested either the existence of brain injury or that such injury was caused by the crash, none of its experts has seriously controverted the position of plaintiffs that the extreme conditions associated with the crash, including explosive decompression, hypoxia, and impact, exposed plaintiffs to an on-going risk. The very fact in a plaintiff's medical history that he or she was aboard the plane may be found to require continuing observation by specialists competent to identify the symptoms of MBD and associated brain injury.

In a normal case, of course, it is up to each plaintiff to establish the nature of his or her injury and the fact that such injury was proximately caused by the conduct of the defendant. In this case, however, Lockheed has agreed to be responsible for all injuries caused by the crash. It now seems appropriate to invite submissions from the parties as to whether the cost of continuing medical observation is an item of compensable damages proximately caused by the crash that put plaintiffs at risk for brain damage by virtue of their presence on that plane.

The parties have had extensive pretrial consideration and three complete trials. They have presented voluminous relevant evidence, and a good deal more. The testimony of each party has been subject to rigorous cross-examination, and the issues sharply framed. Accordingly, the Court is now inviting consideration by the parties of a possible summary judgment that Lockheed is liable for the costs of providing medical observation and diagnosis for the potential injuries to which plaintiffs have been exposed by the crash.

To this end, the Court will schedule a status call at which the parties should be prepared to suggest dates for appropriate filings, including motions, simultaneous memoranda and proposed findings and conclusions, and replies thereto, addressing the issue of whether the Court should enter partial summary judgment with respect to defendant's responsibility for medical oversight for all plaintiffs who can establish their presence aboard the C5–A in the manner prescribed by the Stipulation of December 6, 1979. Third-party defendant the United States should be prepared to submit such memoranda separately in a filing that reflects, *inter alia*, the views of the Office of the Assistant Attorney General for the Improvement of the Administration of Justice.

### C.

█ In addressing a plan for handling the remaining cases, the parties should weigh the fact that the Court has discretion first, to require that the trials be held in the order of the "ripeness" of plaintiffs' medical condition, regardless of the date on which the complaint was filed or the tactical concerns of the parties; and, second, to postpone, if necessary, the trials of those plaintiffs whose permanent medical condition cannot be as accurately ascertained as will be possible when they are a few years older and further advanced in school. As the Supreme Court noted in *Landis v. North American Co.*, 299 U.S. 248, 254–55, 57 S.Ct. 163, 166, 81 L.Ed. 153 (1936), there is

> power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

*See also Dellinger v. Mitchell*, 143 U.S.App. D.C. 60, 64, 442 F.2d 782, 786 (1971).

Usually, of course, a speedy trial is the justest trial. In the unusual circumstances of many cases here, however, a "juster" trial might be a delayed one, conducted when an infant plaintiff's condition has more nearly "gelled," and the extent of his or her injury can be more precisely delineated than now seems possible. Trial at that later stage could be shorter, less costly, and less confusing; it could result in substantial economies to the Court and the parties; and, verdicts should more nearly compensate plaintiffs fairly for whatever injuries it turns out they have sustained. The fact that the statute of limitations would not bar plaintiffs' claims for many years is instructive. The traditional concern that witnesses may not be available or that their memories may grow stale with delay is not an issue here. Liability has been, in effect, determined by stipulation; and the testimony of those witnesses that would be common to all the trials has already been taken at least once, subject to rigorous and protracted cross-examination.

## D.

More substantial is the concern that delay because of docket considerations or postponement would be manifestly unjust, by depriving those plaintiffs with a *prima facie* case of injury of a jury trial and of the means to obtain indicated medical diagnosis and treatment and special educational services. Even prejudgment interest would not protect a plaintiff against possible irreparable injury that might occur from the want of rehabilitative and medical services while awaiting an opportunity for trial.

When in the past courts have confronted complex problems which because of time factors proved intractable to solution by legal action for damages, equity (or admiralty) has fashioned a remedy to prevent irreparable injury. For example, long before Congress provided special federal jurisdiction for corporate reorganizations, courts, finding it impossible to enforce the claims of creditors of a failing corporation without irreparable injury to the interests of stockholders, employees, and the public in the going concern value of a business, fashioned equitable remedies in the nature of corporate reorganization. *See First National Bank v. Flershem*, 290 U.S. 504, 54 S.Ct. 298, 78 L.Ed. 465 (1934); *National Surety Co. v. Coriell*, 289 U.S. 426, 53 S.Ct. 678, 77 L.Ed. 1300 (1933). Even though the creditors had a legal right to be paid in full forthwith, equity stayed and adjusted those claims in the expectation that they could be satisfied from the future earnings of the going concern (saved from destruction by equity) while the stockholders, employers and the public were spared the total loss which would have resulted from forthwith execution of the creditors' money judgments. Similarly, admiralty has long recognized the right of an injured seaman to "maintenance and cure" independent of, and prior to the adjudication of, any claim for damages resulting from the injury. *Pacific S.S. Co. v. Peterson*, 278 U.S. 130, 134–38, 49 S.Ct. 75, 76–77, 73 L.Ed. 220 (1928). Courts administering estates provided emergency distribution to decedents' widows and children pending final proceedings. Additionally, courts have inherent

power, confirmed by statute, *see, e. g.*, D.C. Code § 16–911, to award alimony, child support and even "suit money" *pendente lite* without inquiring into the merits of an action or determining the probability of success. *See Kreuz v. Kreuz*, 354 A.2d 867 (D.C.1976); *Hood v. Hood*, 138 Md. 355, 113 A. 895 (1921).

## E.

■ In order to bring a possible summary judgment to issue and to meet the other serious concerns outlined herein, the parties shall be prepared at the upcoming status call to submit, in addition to the filings related to a possible summary judgment, proposed preliminary and permanent injunctions, together with proposed findings of fact (with appropriate references to exhibits and the transcript) and conclusions of law with respect to a plan that would include the following elements:

1. Payments by Lockheed to a fiduciary sufficient to provide all plaintiffs with diagnostic services made necessary by their exposure in the crash to the risk of possible brain damage, particularly MBD. Such payments would be directed by a permanent injunction based upon the proposed partial summary judgment.

2. Payments to the fiduciary by Lockheed to provide medical and educational services to those plaintiffs who show signs of injury in order to prevent or mitigate irreparable injury during the period before their cases are ready for trial. These payments would be mandated by a preliminary injunction based upon the findings outlined herein.

3. Creation of a panel of medical experts, one to be chosen by the plaintiffs, one to be chosen by the defendant and the United States, and one to be chosen by the two experts nominated by the parties. This panel would authorize expenditures from the funds outlined above.

4. Reports as necessary from the fiduciary and the panel to the parties and the Court on the status of plaintiffs' medical condition. It is anticipated that this report

or reports will be used by the parties and the Court to schedule the cases for trial, so that those plaintiffs whose conditions are "ripe" for adjudication will be scheduled for trial as soon as the relevant dockets permit. The cases of plaintiffs whose age or condition makes diagnosis premature will be postponed until such time as the panel indicates that their conditions have become clearer.

5. A pretrial order requiring the parties before or at such time as the panel indicates that the plaintiffs' medical condition is "ripe," to proceed on a prescribed schedule, to conduct reciprocal medical examinations, to exchange reports, and, on the part of the defendant, to make an unconditional offer of settlement (which may be zero), and, on the part of the plaintiff, to accept defendant's offer or make a counteroffer by a prescribed date.

6. Prompt trial thereafter of all plaintiffs' claims not removed from the case by the proposed partial summary judgment or disposed of by settlement. Any judgment that a plaintiff receives as a result of a jury verdict would be offset by any amounts expended on his or her behalf for interlocutory medical services outlined in number 2, *supra.*

7. Preparation by the parties of a stipulated record and a proposed pretrial order for each case that would facilitate trial of each of these cases by any judge of this District Court, assigned on a random basis pursuant to Rule 3–3, D.D.C. R.

### III.

#### A.

■ A mandatory preliminary injunction to provide interim treatment may be appropriate at this stage to protect and maintain the medical status quo of the infant plaintiffs until their claims can properly be adjudicated. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Association v. FPC,* 104 U.S.App.D.C. 106, 259 F.2d 925 (1958). Any substantial delay now in providing necessary treatment of symptoms as they develop may cause considerable permanent damage or make the damage so far incurred irreversible. The testimony is uncontroverted that for those children who are suffering from minimal brain dysfunction, proper and prompt treatment will limit the extent of their permanent disability. This prospect, as well as the substantial burden on individual families of providing the means for such treatment prior to settlement or adjudication, constitutes and threatens clear irreparable injury. The burden on Lockheed is relatively minor by comparison. The proposed payments would be used only to treat injuries presumptively connected by the panel to the crash and for which Lockheed could be expected to pay in any event. Any expenditure would be set off against any judgment ultimately won by plaintiffs in trial before a jury. The net liability will be shared by the United States. If Lockheed were to win a verdict, it would be legally entitled to recover from the individual plaintiffs the sums expended.

The public interest would be plainly served by this interim relief. In addition to facilitating the efficient and fair administration of justice by permitting the postponement of trials of unripe issues, this injunction would minimize any permanent disability that plaintiffs may suffer. The public has a demonstrable interest in avoiding tragic and needless injury that may ultimately be translated into public expenditures for welfare, social and rehabilitative services, and public safety.

Finally, it is clear that plaintiffs may demonstrate a sufficient probability of success on the merits to justify mandatory interlocutory relief. By virtue of having presided over the discovery for all these actions, and the trial on the merits of three cases, the Court has had an unusual opportunity to hear and assess the evidence available to both sides in the prospective cases. The record suggests that a significant proportion of the plaintiffs suffer from some form of brain injury or dysfunction; the frequency of this problem may be wholly out of proportion with the natural appear-

ance of such problems in the general population. In view of the fact that these infants shared the common experience of the plane crash, the inference is strong that there is a substantial likelihood that they may demonstrate that such injuries are causally related to the crash.

In similar contexts, courts administering multi-district or complex actions have relied on the probability of recovery and the likelihood of irreparable injury prior to settlement or trial to fashion extraordinary interim remedies. Thus, the Court in *In Re Air Crash Disaster Near Chicago, Ill.,* 480 F.Supp. 1280 (N.D.Ill.1979), announced at the outset of litigation its intention to award to plaintiffs prejudgment interest. The Court, finding its authority expressly from equitable powers, 480 F.Supp. at 1286, suggested that the purpose of awarding prejudgment interest would be to "insure fair and expeditious disposition of litigation of this type," 480 F.Supp. at 1288, and reduce the incentive for delay. Similarly, the Court in *Mayer v. Braniff Airways, Inc.,* 310 F.Supp. 149 (N.D.Ill.1970) was also faced with the unique problems posed by aircraft disaster litigation. There, both the liability of the defendants collectively and the amount of damages had been determined, but the defendants intended to litigate among themselves their respective shares of the damages. In order to prevent unfairness to the plaintiffs, the Court ordered each of the two defendants to deposit with the Registry of the Court an amount equal to one-half the total judgment, with directions to the Clerk to disburse the funds to the plaintiffs. In the event that the amount paid by one of the defendants exceeded its ultimate liability, the order anticipated that remaining funds would be returned by the Registry or recovered from the other defendant. 310 F.Supp. at 153. Both of these opinions recognized that where ultimate recovery is likely, the Court has power to take interim actions to encourage the fair and expeditious adjudication of the cases and to relieve the plaintiffs in such cases from the enormous pressure to settle quickly in order to avoid the expense and delay of long and costly litigation against formidable and well-financed defendants.

Plainly, mandatory interlocutory relief is not common, but neither is it prohibited. Rather, the burden imposed by the relief must be weighed in the context of all the other relevant factors, including the likelihood of success, the risk of irreparable injury, the relative burden upon the parties and the public interest. See *Developments in the Law—Injunctions,* 78 Harv.L.Rev. 994, 1060–61 (1965); *see also Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d at 844. In these circumstances, where the need for immediate relief is so pressing and the likelihood of success—after three trials—so substantial, extraordinary relief tailored to this particular situation is appropriate.

### B.

To the extent that the proposed interlocutory relief compensates plaintiffs for injuries allegedly suffered in the crash, it raises the risk that the parties will be denied their right to a jury trial on this issue. Whatever imposition on the parties' right to a jury that the procedure entails, however, is both necessary and carefully tailored to the exigencies of this situation. The services to be provided are limited to medical and educational services necessary to permit the infant plaintiffs to develop as normally as possible and to reduce the risk of permanent injury which might otherwise occur. The fund is in no way intended to serve as a "damage fund," *compare Mayer v. Braniff Airways, Inc., supra.* It will be available to plaintiffs only until their causes "ripen" and are presented to a jury; it will not be used to compensate plaintiffs for the effect of any permanent disability arising from any brain injury, nor will it be available to compensate plaintiffs for any of the other claims which they raise, including prior medical expenses, pain and suffering, or psychological trauma. Moreover, the procedure outlined here anticipates that unless the parties reach a settlement, all issues will eventually be tried before a jury. All amounts expended on behalf of plaintiffs

for treatment will be set off against any judgments that they might receive. The plan will further be designed to recognize the defendant's right to recover any amounts expended in the event that a jury returns a verdict for the defendant.

There is, of course, the theoretical possibility that Lockheed will be compelled by equity to provide some compensation to plaintiffs which it might not recover despite a later jury verdict in its favor. To this extent, the effect of a jury's verdict would be undermined by prior equitable action. The Court is of course sensitive to the parties' right to a jury trial in actions at law. Moreover, it is clear that a tort action for damages is ordinarily the type of claim that would be adjudicated entirely by a jury, without the interlocutory intervention of equity. *See Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Columb.L.Rev. 43 (1980). However, it is also clear that the Supreme Court has not commanded a wooden approach to this issue, and has recognized that in certain special circumstances, the right to a jury trial may be limited. *See Ross v. Bernhard*, 396 U.S. at 538 n. 10, 90 S.Ct. at 738 n. 10; *Dairy Queen Inc. v. Wood*, 369 U.S. at 478, 82 S.Ct. at 900; *see generally*, Note, *The Right to a Jury Trial in Complex Civil Litigation*, 92 Harv.L.Rev. 898 (1979). As the Supreme Court noted expressly in *Ross*, in determining whether an issue is suitable for a jury, a trial court should take into account "the practical abilities and limitations of juries" in addition to the traditional factors of premerger custom and the remedy sought. 396 U.S. at 538 n. 10, 90 S.Ct. at 738 n. 10.

In applying the Ross test to the present circumstances, the Court is faced with a Hobson's Choice: because of the number of claims and the changing and uncertain manifestations of brain injury to infants and young children, some cases are not as susceptible to jury trial as they will in time become; if the cases were to be tried now, they would of necessity have to be presented to the Court. *See* cases collected at 92 Harv.L.Rev. at 904 n. 38. Yet to delay all relief to preserve the possibility of a jury trial would expose the plaintiffs to irreparable injury. The solution proposed here most nearly preserves the possibility of a complete and binding jury verdict on all issues, while ensuring that the plaintiffs suffer no needless injury or deterioration in the interim. This outcome best comports with the commands of both the seventh amendment and the due process guarantee of the fifth amendment.

In anticipation of the development of this procedure and the pending motions for new trials, the judgments in *Schneider* and *Zimmerly* will remain under advisement pending a status call to be held on June 9, 1980, and the submissions to be scheduled there.

It is SO ORDERED.