**FRIENDS FOR ALL CHILDREN, INC.,**
as legal guardian and next friend of the
named 150 infant individuals, et al.

v.

**LOCKHEED AIRCRAFT CORPORA-
TION, Appellant, United States
of America.**

No. 84–5213.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 31, 1984.

Decided Oct. 12, 1984.

As Amended Oct. 12, 1984.

See also 533 F.Supp. 895, 563 F.Supp.
552.

Richard M. Sharp, Washington, D.C., with whom William F. Sheehan and Carroll E. Dubuc, Washington, D.C., were on brief, for appellant. William S. Moore, Washington, D.C., also entered an appearance for appellant.

J. Vernon Patrick, Jr., Birmingham, Ala., with whom Oren R. Lewis, Jr., Arlington, Va., and William M. Cohen, Washington, D.C., and Marvin H. Campbell, Montgomery, Ala., were on brief for appellees, Friends for All Children, Inc., et al. Richard H. Jones, Arlington, Va., also entered an appearance for appellees, Friends for All Children, Inc., et al.

Joseph E. diGenova, U.S. Atty. and Mark A. Dombroff, Dept. of Justice, Washington, D.C., entered appearances for appellee, U.S.A.

Before MIKVA, BORK and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge STARR.

STARR, Circuit Judge.

This is a tort action on behalf of Vietnamese orphans for injuries suffered in a tragic aviation accident in South Vietnam in 1975. The suit is over eight years old, and this appeal is the fourth before this court. Seven years after the action was filed, the District Court granted partial summary judgment on a motion on behalf of the Vietnamese children adopted by non-U.S. parents, holding that Lockheed was liable for the cost of diagnostic examinations of the children. Finding that approximately forty adopted Vietnamese children living in France faced irreparable injury unless they promptly obtained diagnostic examinations, the court entered a mandatory injunction *pendente lite*. The injunction ordered Lockheed to create a $450,000 fund

from which reasonable expenses of diagnostic examinations would be paid.

The first of the two principal issues before us is whether the law of tort of the District of Columbia encompasses a cause of action for diagnostic examinations in the absence of proof of actual injury. Determining that such a cause of action does exist, we then turn to consider whether the existence of any material, disputed facts precludes the entry of summary judgment against Lockheed and whether partial summary judgment is likely to prejudice Lockheed in subsequent jury trials.

The second principal issue requires us to assess the propriety of mandatory preliminary injunctive relief in a common law tort action in which the defendant has already been adjudicated liable but where a trial to determine the amount of liability will be so long delayed that, in the interim, the plaintiffs face irreparable injury. Deciding that in the specific circumstances of this case such an injunction can be justified conceptually under general equitable principles, we then consider whether the injunction abridges Lockheed's constitutional rights to due process and jury trial. Determining that the injunction indeed passes constitutional muster, we then find that the order neither violates the terms of certain stipulations entered into in 1979 between the parties nor impermissibly shifts the cost of litigation to the defendant. Finally, we canvass the traditional factors requisite to the award of interim equitable relief. Upholding the District Court's determination that these factors favor issuance of the injunction, we affirm the judgment below.[1]

## I

This appeal is another chapter in the protracted litigation arising out of an aviation accident during "Operation Babylift," a rescue mission for Vietnamese orphans undertaken in the last days of United States presence in South Vietnam. The tragic circumstances of the aircraft disaster are completely set out in *Schneider v.* *Lockheed Aircraft Corp.*, 658 F.2d 835 (1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982), and need not be fully repeated here. Suffice it to say that on April 4, 1975, a Lockheed C5A Galaxy aircraft took off from Saigon en route to the United States. On board the ill-fated flight were 301 passengers, most of whom were Vietnamese orphans. Fifteen minutes after takeoff a locking system failed, causing the aft ramp and cargo doors to fall off the aircraft. The interior compartments of the plane thereupon suffered an explosive decompression and loss of oxygen. Immediately turning the aircraft back toward Saigon, the pilot attempted a crash landing, but on impact the aircraft shattered into four large pieces and countless fragments. Almost all the orphans and attendants in the cargo compartment of the aircraft were killed. However, 149 of the 152 orphans in the aircraft's troop compartment survived. Most of these orphans were infants at the time of this tragedy.

The next day the surviving orphans were flown to San Francisco where they were examined briefly by U.S. military physicians. They were then released to their adoptive parents, about half of whom were Europeans.

On April 2, 1976, an organization called Friends For All Children ("FFAC") filed a complaint in the United States District Court for the District of Columbia, alleging that Lockheed's negligent manufacture of the C5A aircraft was the cause of the disaster. FFAC claimed to be the legal guardian of the surviving children and alleged that as a result both of the decompression of the troop compartment and the crash itself, these survivors suffered, *inter alia,* from a neurological development disorder generically classified as Minimal Brain Dysfunction ("MBD").

Countering that negligent maintenance and operation of the aircraft by the U.S. Air Force had proximately caused the

---

**1.** This court affirmed the District Court's judgment by order filed July 2, 1984. In that order, we indicated that an opinion would subsequently be published.

crash, Lockheed denied liability and impleaded the United States as a third party defendant. Both Lockheed and the Government then engaged in a variety of legal maneuvers aimed at securing dismissal of the suit. It is the duration of these preliminary skirmishes rather than their substance that is relevant to this case.[2] At various times in 1978, the District Court rejected both the Government's and Lockheed's motions to dismiss, and the parties accordingly passed the rest of 1978 and 1979 engaging in discovery.

On December 6, 1979, over three years after suit was filed, the District Court approved the entry of various stipulations. The express purpose of these stipulations was to save "time and expenses of all parties and of the court," Preamble to Stipulation of Sept. 14, 1979, J.A. 72, and "to accomplish the fair and expeditious compensation of those children injured, without reference to fault or responsibility." Stipulation No. 10, J.A. 77. In the stipulation, the plaintiffs agreed not to seek punitive damages; in return, Lockheed agreed not to contest liability in all cases in which the parents or guardians filed amended complaints.[3] Second, the stipulations provided that Lockheed would pay to the guardian *ad litem* $5,000 for every child for whom an amended complaint was filed. The guardian *ad litem* enjoyed discretion to use these funds for the infants' "medical treatment" and "therapy" or for the "infant plaintiffs' litigation expenses."[4] Supplemental Stipulation of Sept. 12, 1979, J.A. 80.

The 1979 stipulations contemplated that three children would be selected for initial trials. Stipulation No. 11 of Sept. 14, 1979, J.A. 76. The parties and the court anticipated that the trial of these cases would, as frequently happens in such multi-party cases, provide the necessary information about probable litigation results so that settlements in other cases would likely follow. *See Friends For All Children v. Lockheed Aircraft Corp.*, 87 F.R.D. 560, 562 (D.D.C.1980).

The "bellwether" cases contemplated by the stipulations all involved American-adopted children. Following jury trials, two of the plaintiffs, Schneider and Marchetti, secured judgments of $400,000 and $1,000,000 respectively. A third plaintiff, Zimmerly, received nothing for his MBD claim in his first trial, but a retrial ordered by the District Court resulted in a judgment of $500,000.[5] Those "bellwether" trials, however, did not result in swift settlement.

When it became clear that the bellwether trials were not going to result in a global settlement, the District Court suggested *sua sponte* that it would entertain motions (1) for summary judgment on the issue of Lockheed's liability for diagnostic examinations and medical treatment, and (2) for preliminary relief ordering Lockheed to pay for such examinations and treatment *pendente lite*. Responding to this suggestion, the plaintiffs thereafter moved both for summary judgment and interim equitable relief. The District Court held hearings on the plaintiffs' motions, but before the court

2. Lockheed moved for summary judgment, contending that FFAC lacked capacity to sue on behalf of the children. The United States moved to dismiss on the ground that Lockheed's action was barred by 28 U.S.C. § 2680(k), which excepts claims arising in a foreign country from the scope of the Federal Tort Claims Act. The United States also moved to disqualify FFAC's counsel for improper solicitation. *See Schneider v. Lockheed, supra,* 658 F.2d at 839.

3. The United States also agreed not to contest its liability to Lockheed for indemnification or contribution with respect to compensatory damage awards. Stipulations Nos. 1–3 of Sept. 14, 1979, J.A. 73–74.

4. For text of this stipulation see *infra* p. 833. A third stipulation provided that Lockheed would pay to each plaintiff "the greater of (a) thirty percent (30%) of the amount of any ... judgment or (b) fifty percent (50%) of the largest settlement offer ... notwithstanding any appeal ...." Supplemental Stipulation No. 1 of Sept. 14, 1979, J.A. 80.

5. The case of another American plaintiff, Kurth, also went to trial and Lockheed prevailed. The jury verdict in *Kurth,* however, was set aside by the District Court.

issued a ruling, the parties entered into a tentative agreement that would have paid for certain of the plaintiffs' expenses for diagnosis and treatment. In early 1981, however, the Department of Justice vetoed the agreement. Memorandum Opinion of April 4, 1984 [hereinafter "Mem. Op. II"] at 5–6, J.A. 10–11.

Meanwhile, Lockheed appealed the jury verdicts in the three "bellwether cases." In *Schneider v. Lockheed Aircraft Corp., supra,* this court reversed the judgments in those cases on the ground that the District Court had improperly treated a statement of Lockheed's counsel in a jurisdictional proceeding as an admission that the infants were probably injured as a result of the crash. 658 F.2d at 842–43. Moreover, the *Schneider* court effectively prevented a plaintiff's victory in one trial from being used in other cases for collateral estoppel (issue preclusion) effect on the issue whether the accident caused other plaintiffs to suffer from MBD. *Id.* at 852. The plaintiffs were thus faced with the bleak prospect of scores of individual trials.

In light of this court's decision with respect to collateral estoppel, plaintiffs renewed their discovery efforts in order to obtain materials which would more graphically demonstrate the impact of the crash. In this process, plaintiffs discovered approximately 1,000 photographs of the accident scene that had been requested at the outset of discovery but had never been produced. During the course of discovery, it also became apparent that the Air Force had actually destroyed evidence. After these revelations, a general settlement was reached among Lockheed, the Government, and most *American plaintiffs.* Under a stipulation approved by the District Court on August 28, 1982, Lockheed and the United States agreed to pay $13.5 million in settlement of the claims of forty-five American plaintiffs. Separate settlements with other American plaintiffs resulted in a total recovery of $17 million. The American plaintiffs averaged $300,000 each in settle-

ment, and every American plaintiff has received a substantial recovery.[6] Mem.Op. II at 9, J.A. 14.

The *foreign plaintiffs,* however, were not included in the settlement. Adjudication of the foreign plaintiffs' claims had been delayed by virtue of their having to do battle in various legal skirmishes which the American plaintiffs were spared. First, on June 13, 1980, Lockheed moved to dismiss the cases of all infant plaintiffs adopted by foreign parents on the ground that the District of Columbia was not a convenient forum for adjudication of the disputes. The District Court denied the motion. On November 20, 1980, Lockheed renewed its *forum non conveniens* motion in the wake of this court's decision on *forum non conveniens* issues in *Pain v. United Technologies Corp.,* 637 F.2d 775 (D.C.Cir.1980), *cert. denied,* 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981). The District Court once again denied the motion and in April 1982, certified its ruling for interlocutory appeal under 28 U.S.C. § 1292(b) in order to facilitate settlement by removing an issue on which "there was substantial ground for difference of opinion." Mem. Op. II at 10, J.A. 15. This court affirmed the District Court's order in *Friends For All Children v. Lockheed,* 717 F.2d 602 (D.C.Cir.1983). Despite the steadfast efforts of the District Court to bring these cases to a just and expeditious resolution, no general settlement appeared imminent.

Therefore, in the waning days of 1983, almost seven years after this suit was filed and almost eight years after the accident occurred, the parties and the District Court were faced with the prospect of trying approximately seventy cases involving foreign plaintiffs. Even if distributed among the judges of the District Court, the cases would likely take years to try. *See Friends For All Children v. Lockheed, supra,* 87 F.R.D. at 563. Confronting this unhappy prospect, the plaintiffs renewed their motion for partial summary judgment

---

**6.** Plaintiffs assert that every American plaintiff received at least $125,000 in settlement, *see*

Brief of Appellees at 14, and defendant does not dispute this proposition.

as to Lockheed's liability for medical diagnosis and treatment of MBD and for an injunction *pendente lite* ordering Lockheed to provide funds for such diagnosis and treatment. The court held twelve days of hearings on these motions.

In memorandum opinions dated March 16, 1984, and April 4, 1984, the District Court granted plaintiffs' motion for partial summary judgment on the issue of Lockheed's liability for the children's diagnostic examinations. 587 F.Supp. 180. The District Court concluded that although *Schneider v. Lockheed, supra,* mandated individual trials on the issue whether the accident was the proximate cause of injury, "[i]t cannot be reasonably disputed that the need for some *diagnostic* examinations ... is itself a proximate result of this particular crash." Memorandum Opinion of March 16, 1984 [hereinafter "Mem. Op. I"] at 7, J.A. 43 (emphasis in original). The District Court, however, denied partial summary judgment on the issue of Lockheed's liability for *treatment* because any such liability was dependent on a finding that the accident was the proximate cause of injury to each individual plaintiff.

The District Court further found that the cost of the diagnostic examinations was "bitterly disputed" and therefore held that summary judgment would not lie as to the *amount* of Lockheed's monetary liability. Mem. Op. II at 20, J.A. 25. The court, however, did grant plaintiffs' motion for a mandatory preliminary injunction ordering Lockheed to create a fund from which the costs of diagnostic examinations for the French plaintiffs could be drawn.[7]

Fully recognizing that such an injunction was quite unusual, the court noted several exceptional factors militating in favor of

extraordinary relief. First, the court emphasized that Lockheed had stipulated as to its liability for compensatory damages. Inasmuch as the court had granted partial summary judgment holding that the accident was the proximate cause of the need for diagnostic examinations, Lockheed was now, by virtue of its own stipulations, liable for the cost of such examinations. The court stated that plaintiffs had no adequate remedy at law, because the "extreme delay inherent in the complexity of this unique litigation, the number of plaintiffs, and the litigation tactics of the defendant renders any ultimate award of damages inadequate to remedy the immediate needs of the plaintiffs." Mem. Op. I at 12, J.A. 48.

Once the concept of an equitable injunction had been justified in the particular circumstances of this case, the court canvassed the traditional factors governing whether an injunction *pendente lite* is appropriate. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921 (D.C.Cir.1958). The District Court first concluded that the approximately forty French plaintiffs would be irreparably injured in the absence of an injunction.[8] Mem. Op. I at 11, J.A. 47. In the court's view, examinations were needed "immediately. The urgency arises from the fact that many of the alleged disorders ... can be adequately treated and the disabling symptoms minimized only if identified early in life, and before the onset of adolescence." *Id.* The court made a specific factual finding that French public health services do not provide the kind of comprehensive diagnostic examinations required

---

**7.** The foreign plaintiffs reside in various European countries, principally France. The court, however, concluded that the public health services in all European countries save for France were likely to pay for diagnostic examinations. Accordingly, the relief mandated here ran only to the French plaintiffs.

**8.** The District Court concluded that nine other French plaintiffs would not be irreparably injured if Lockheed failed to provide funds for diagnostic examinations. Mem.Op. II at 25, J.A.

**30.** One French plaintiff, Magali Maupoint, had received "exhaustive medical examinations" in preparation for an upcoming trial. *Id.* at 20, J.A. 25. On March 16, 1984, eight other French plaintiffs received $5,000 through operation of the 1979 stipulations. In the absence of any reason to believe that expending money to prosecute the litigation would facilitate prompt settlement, the District Court held that those funds should be used for diagnostic examinations.

to determine if the children are suffering from MBD. *See* Mem. Op. II at 26, J.A. 31. The court accordingly found that French plaintiffs were unlikely to receive the needed comprehensive examinations, *see* Mem. Op. II at 18, J.A. 23, and stated that "if the underlying neurological disorders, if any, remain undiagnosed ... much longer, the prognosis for these children, who are nearing adolescene [sic], is poor." *Id.*

Turning to the element of likelihood of success on the merits, the District Court concluded that plaintiffs had made a strong showing that a jury would award damages equivalent to the cost of reasonable diagnostic examinations. *See* Mem. Op. II at 24, J.A. 29; Mem. Op. I at 13, J.A. 49. Weighing the balance of hardships between the plaintiffs and defendant, the District Court acknowledged some risk to Lockheed because of the possibility that a jury would award less in damages to a particular plaintiff than he or she had already received from the fund, but the court nonetheless concluded that the threat of leaving undiagnosed the potentially deteriorating medical condition of MBD posed a much greater risk. The court further stated that diagnostic examinations might identify disorders among the plaintiff children that could be treated and minimized, thereby saving the defendant compensatory costs in the long run. Mem. Op. I at 14, J.A. 50.

Finally, the court concluded that the injunction would serve the public interest. Diagnostic examinations, the court observed, "may finally produce the sort of hard data on the medical condition of these children that defendant purports to require before it will even consider settlement of these cases." Mem. Op. I at 15, J.A. 51. In light of the enormous burden that these cases continue to impose on the judicial system, the court held that facilitating settlement of this complex and protracted litigation was clearly in the public interest.

Pursuant to the injunction, the court ordered Lockheed to deposit $450,000 into the Registry of the District Court. The court calculated this amount by prorating the $550,000 amount that plaintiffs claimed would be necessary to fund "screening" and diagnostic examinations for approximately fifty-three plaintiffs. Fully aware that plaintiffs' proffered measure of the amount did not provide a definitive standard, the court nonetheless determined that "[i]n the light of the circumstances ... the examinations should not be delayed to determine these precise costs." Mem. Op. II at 21, J.A. 26.

To minimize hardship to Lockheed and to prevent excessive funds from being expended, the District Court fashioned a "voucher" system to govern disbursements from the fund. Under this system, no funds are to be distributed until (1) the guardian *ad litem* submits a voucher detailing expenses incurred or anticipated, and (2) Lockheed has had an opportunity to respond to the proposed disbursement. Expenses not directly related to the provision of diagnostic examinations are to be disallowed. Mem. Op. II at 30, J.A. 35. Moreover, the District Court established a procedure whereby a panel of experts is to decide what further diagnostic tests should be given an individual child.[9] Once again, Lockheed will have an opportunity at this juncture to respond by arguing that the record does not support a determination that the plaintiff is likely to succeed at trial in winning compensation for a particular test.[10] Mem. Op. I at 16, J.A. 52.

Lockheed unsuccessfully sought a stay of this injunction in both the District Court and this court. Here on appeal, Lockheed contends that summary judgment is improper because (1) no cause of action exists under District of Columbia tort law for placing a plaintiff "at risk"; (2) material

9. The panel would presumably include a pediatrician, a psychologist, a psychiatrist and a neurologist. *See infra* IV A2.

10. The District Court also required Lockheed's funds to be placed in an interest bearing account which, in the absence of a showing of

good cause, would revert to Lockheed after completion of the diagnostic examinations. Mem.Op. I at 17, J.A. 53. The District Court required plaintiffs to post a bond of $100 in return for Lockheed's deposit of funds.

facts are in dispute as to the proximate cause of the need for diagnostic examinations; and (3) the grant of partial summary judgment will impose a substantial risk of confusing the trier of fact. Lockheed also contends that even if summary judgment was appropriate, the entry of a mandatory preliminary injunction was improper because interim injunctive relief (1) cannot be awarded in an action which ultimately seeks only the legal remedy of money damages; (2) denies Lockheed its constitutional rights both to due process and to a jury trial on damages; (3) impermissibly shifts the costs of litigation to Lockheed; and (4) violates the 1979 stipulations among the parties. Finally, Lockheed argues that plaintiffs do not in any event satisfy the normal standards for an award of preliminary injunctive relief.[11]

## II

The District Court's entry of interim relief requires us to undertake a two-step analysis. First, we will review the grant of partial summary judgment with respect to the issue whether Lockheed is liable for the cost of diagnostic examinations. Then we will review the propriety of entering a mandatory preliminary injunction for which the grant of summary judgment served as necessary predicate.

### A

Lockheed's first argument is that District of Columbia tort law has not heretofore recognized a cause of action for recompense for diagnostic examinations designed to discover whether an individual has been injured, unless the individual has first proved actual physical injury. Relying upon cases from other jurisdictions suggesting that the common law of tort does not encompass an action for being put "at risk," Lockheed argues that if the District of Columbia courts were presented with this action they likewise would decline as a matter of law to recognize it.

█ As this action comes before us as a diversity case, we are, of course, obligated to apply District of Columbia law.[12] *See Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 360–61 (D.C.Cir.1983) (holding that the principle of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), fully applies to federal courts in the District of Columbia when they exercise jurisdiction over state-created causes of action). District of Columbia law, however, is silent on the specific issue whether a plaintiff may maintain an action for diagnostic examinations in the absence of proof that he or she was physically injured. The lack of clarity of tort law in this jurisdiction, however, does not absolve this court of the duty of resolving the issue in the manner which, in our best lights, we predict that the District of Columbia Court of Appeals would were it presented with the question.[13] In light of general princi-

---

**11.** In an order filed on August 13, 1984, the District Court modified the preliminary injunction to permit plaintiffs whose cases were "assigned to an individual judge for pretrial and trial" to "apply for an advance of a portion of the anticipated cost of any diagnostic examination, the results of which will be the plaintiff's primary expert medical evidence in that trial." In a memorandum accompanying the order, the District Court explained that this modification was addressed to a "hybrid" category of five cases that, since the entry of the preliminary injunction, had been assigned to other District Judges for trial and which were anticipated to go to trial in the fall or early winter of 1984. In a further order of September 10, 1984, the District Court expressly limited the charge against the funds for four projected examinations to no more than one-half of the total cost of these exams, or $11,500, whichever is smaller.

**12.** Analytically prior to the question whether the District of Columbia's substantive tort law recognizes the plaintiff's cause of action is the issue of which jurisdiction's substantive tort law the District of Columbia conflict of laws directs us to apply in the circumstances here. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941) (holding that in diversity cases the federal courts must follow the conflict of laws rules prevailing in the state in which they sit). Since the plaintiffs, defendant, and the District Court agree that District of Columbia tort law should apply, we need not pause to canvass the conflict of laws issue.

**13.** *See, e.g., Daily v. Parker*, 152 F.2d 174, 177 (7th Cir.1945) ("In the absence of a state court ruling, our duty is tolerably clear. It is to decide, not avoid, the question.").

ples of tort law, the *Restatement (Second) of Torts,* and the law of other jurisdictions, we believe that the District of Columbia Court of Appeals would recognize such a cause of action. Sustaining a cause of action for diagnostic examinations in the circumstances here serves the two principal purposes of tort law—the deterrence of misconduct and the provision of just compensation to victims of wrongdoing. Moreover, we believe that the cases cited by Lockheed from other jurisdictions are readily distinguishable: their refusal to recognize a cause of action for being put "at risk" is grounded upon difficulties of speculative proof which quite clearly do not exist in this case.

To aid our analysis of whether tort law should encompass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:

Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.

From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action. A cause of action allowing recovery for the expense of diagnostic examinations recommended by competent physicians will, in theory, deter misconduct, whether it be negligent motorbike riding or negligent aircraft manufacture. The cause of action also accords with commonly shared intuitions of normative justice which underlie the common law of tort. The motorbike

rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services—a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life. Under these principles of tort law, the motorbiker should pay.

Similarly, in this case, the crash exposed the plaintiffs to the risk of serious brain damage. The District Court explicitly found that, in the opinion of competent medical experts, comprehensive diagnostic examinations are needed to determine whether and to what extent treatment may be necessary. According to the District Court:

Defendant's and plaintiffs' experts, as usual, agreed on very little. They did agree, however, that most if not all these children should receive a comprehensive set of diagnostic examinations to identify their maladies, if any, and to determine appropriate treatment. The experts also agreed that the examinations should be performed without delay if there is to be meaningful treatment for the ones who suffer disorders.

Mem. Op. I at 6, J.A. 42. The court's memorandum quoted directly from both the defendant's and the plaintiffs' experts in support of this finding.

Although Lockheed may be able to show that, in individual cases, brain damage was not caused by the accident, the District Court correctly concluded that the crash proximately caused the need for a comprehensive diagnostic examination. The court found that no diagnostic examinations would be necessary "but for the fact that these children endured explosive decompression and hypoxia aboard a plane which subsequently crashed, and that after the crash they received relatively cursory, unspecialized examinations from the Air Force without any systematic follow-up by either defendants." Addressing Lockheed's claim that the need for the examinations existed prior to the crash, the court explained: "Even assuming that [many of the plaintiffs had pre-existing neurological

deficits when they boarded the plane], diagnostic examinations of those with such deficits remains necessary to determine which children had pre-existing deficits and whether the crash has a therapeutic effect on previously injured children." *Id.* at 8 n. 7, J.A. 44.

Lockheed argues that the law of tort does not embrace a cause of action for diagnostic examinations. The cases Lockheed cites for the general proposition that the common law recognizes no action for being put "at risk" are readily distinguishable on the grounds that the alleged injury to be compensated was speculative without the corroborative presence of physical injury. For instance, *Mink v. University of Chicago*, 460 F.Supp. 713, 716 n. 2 (N.D.Ill. 1978), held only that those who had been put at risk through the ingestion of Diethylstilbestrol (DES) as part of an experiment could collect compensation neither for the increased risk of cancer to themselves and their children nor for emotional distress unless they exhibited physical symptoms. The "injury" that stems from having an increased risk of disease is obviously speculative. It is both difficult to quantify the amount of increased risk imposed on an individual who does not yet have a disease and difficult to conceptualize what that risk is worth in money damages. In the absence of physical symptoms, emotional distress caused by potential risk may also be thought too speculative to support recovery. *But cf. Davis v. Graviss*, 672 S.W.2d 928 (Ky.1984) (holding that an accident victim who had a permanent defect in her skull could recover "for mental suffering and impairment of earning power resulting from the *fear* caused by the increased risk of future harm") (emphasis added). Here, however, the plaintiffs' need for diagnostic examinations can be shown through competent medical testimony.[14]

■ Moreover, in light of the *Restatement (Second) of Torts'* definition of "injury," we are not obliged to accept Lockheed's implicit claim that undergoing diagnostic examinations does not in itself constitute injury. The *Restatement* broadly defines injury as "the invasion of any legally protected interest of another." *See* RESTATEMENT (SECOND) OF TORTS § 7. It is difficult to dispute that an individual has an interest in avoiding expensive diagnostic examinations just as he or she has an interest in avoiding physical injury. When a defendant negligently invades this interest, the injury to which is neither speculative nor resistant to proof, it is elementary that the defendant should make the plaintiff whole by paying for the examinations.[15]

B

■ Second, Lockheed argues that material facts are in dispute over whether the accident was a but-for cause of plaintiffs' need for diagnostic examinations. Lockheed contends that evidence in the record suggests that, by virtue of their residing in Vietnamese orphanages, the children were already in need of diagnostic examinations for MBD when they boarded the plane. In consequence, the argument goes, Lockheed should not be held responsible for a pre-existing injury.

As principal support for its argument, Lockheed points to a letter which FFAC

---

14. The other published decision on which appellant principally relies, *Morrissy v. Eli Lilly & Co.*, 76 Ill.App.3d 753, 32 Ill.Dec. 30, 394 N.E.2d 1369 (1979), is clearly inapposite. *Morrissy* simply denied class certification to DES victims and specifically stated that the opinion expressed "no determination as to the merits of the plaintiff's claim." *Id.* 32 Ill.Dec. at 34 n. 3, 394 N.E.2d at 1373 n. 3.

15. The need for diagnostic examinations, of course, must be supported by testimony of competent medical experts. That, of course, has been amply satisfied here.

We should observe that it is not surprising that, so far as we are aware, no court has yet spoken directly to the issue whether a tort action to recover solely the costs of diagnostic examinations should be recognized. When the diagnostic examinations disclose actual injuries there is, of course, no difficulty in recovering their costs as part of the normal compensation of physical injury. When no injury is discovered, the cost of the diagnostic examinations will usually not be so great as to warrant a lawsuit, or at least a lawsuit that is worth pursuing to the stage at which a judicial opinion is written.

sent to adoptive parents before the children left Saigon on the ill-fated flight.[16] The letter recommended that each child "have a complete physical exam and extensive lab tests as soon as he arrives." J.A. 91. The letter detailed various physical conditions, such as fever, lung congestion, or diarrhea, from which the children might be suffering upon arrival. *Id.* The letter went on to describe certain psychological problems that the adopted children might encounter: "You may notice that your child lags behind other children his age in his mental and social development .... A few react by becoming hyperactive." *Id.* The letter indicated that infants with psychological problems would require "consistent discipline, tempered with lots of love and understanding." *Id.* at 92.

Review of the grant of summary judgment, of course, requires us to draw all inferences in favor of the opposing party. *See, e.g., Abraham v. Graphic Arts Int'l Union,* 660 F.2d 811, 814–15 (D.C.Cir.1981). We are persuaded, however, that this letter is far too weak a reed on which to support an inference that plaintiffs already stood in need of diagnostic examinations for MBD. First and foremost, the letter does not even mention MBD. While it does mention that some children may be hyperactive, which is sometimes a symptom of MBD (as well as other conditions), it does not suggest that this symptom requires a specific diagnostic examination. Indeed, it is abundantly clear that possible psychological problems mentioned in the letter appear in the context of

suggesting to the adoptive parents that overcoming such problems will require constant "love and understanding." There is no suggestion whatever that the physical examination mentioned at the beginning of the letter in the context of physical illnesses like diarrhea and lung congestion conveyed to parents the need for a diagnostic examination for a subtle illness like MBD.

Accordingly, we decline the invitation to view FFAC's letter as raising a material issue of fact as to whether the airplane accident caused the need for diagnostic examinations for MBD.

### C

Lockheed further argues that partial summary judgment is inappropriate here because it will confuse the jury and prejudice Lockheed in the trials to be conducted with respect to the plaintiffs' principal claims.[17] Lockheed contends that the District Court will be forced to frame jury instructions which, in effect, will announce that Lockheed did cause recoverable harm, the amount of which the jury is to determine. Such an instruction will, according to Lockheed, prejudice the jury in deciding the essential issue whether the crash proximately caused the children to suffer from MBD or other illnesses.

We have every confidence that the District Court will frame the instructions in terms more artful than those Lockheed pessimistically contemplates so as to minimize any potential prejudice. For instance, an appropriate instruction might state that

**16.** Lockheed also relies on a sentence in the footnote of a previous opinion of this court which suggests that MBD is particularly prevalent in adopted children. *Schneider v. Lockheed, supra,* 658 F.2d at 844 n. 5. The suggestion was apparently based on the testimony of one of the defendant's experts at one of the "bellwether" trials. At neither the preliminary injunction hearing nor at the recent *Maupoint* trial, *see infra* p. 828, has Lockheed chosen to renew the contention that MBD is peculiarly prevalent in adoptive children, and the plaintiffs have in fact submitted evidence to the contrary. Critically, Lockheed adduced no testimony at the hearing on the motions for summary judgment and preliminary injunction to suggest that competent physicians would recommend diag-

nostic examinations for MBD merely because a child was adopted.

**17.** The premise of Lockheed's argument is that since partial summary judgment is solely designed to aid in the efficiency of the adjudicatory process and is not a matter of right, the partial grant may be disallowed if it threatens to prejudice the opposing party. Fifth Circuit precedent supports this proposition, *see Powell v. Radkins,* 506 F.2d 763, 765 (5th Cir.), *cert. denied,* 423 U.S. 873, 96 S.Ct. 140, 46 L.Ed.2d 104 (1975), but this court never has had occasion to address the issue. In view of our holding that partial summary judgment was not prejudicial in these specific circumstances, we need not address the question here.

Lockheed has been found liable for costs of examinations to discover *whether* a child has been injured and that it is the jury's duty to determine the reasonable cost of such examinations. However, the instructions would also presumably state that the finding with respect to diagnostic examinations does not imply that the accident, in fact, caused any injury. Nonetheless, if all else fails and the instructions at any of the individual trials are framed so as to be prejudicial, Lockheed will have the usual recourse of appeal to this court.

Moreover, we cannot overlook the fact that the jury instructions in the trial of Magali Maupoint—the only French plaintiff as yet to have gone to trial—do not bear out Lockheed's fear of substantial prejudice. In relevant part, the jury instructions provided:

> If from the evidence and other instructions of the Court you find in favor of the plaintiff, then, in assessing the damage to which she is entitled, you may take into consideration any of the following, which you believe proximately resulted from the accident:

> \* \* \* \* \* \*

> (8) Any medical expenses the plaintiff will probably incur in the future, including any diagnostic examination or examinations of her.

Maupoint Trial Transcript at 3957. At the *Maupoint* trial, the District Court there-fore did not allude at all to the grant of partial summary judgment.

At oral argument, Lockheed conceded that it interposed no objection to this portion of the *Maupoint* jury instructions. Instead, Lockheed contended that the failure to make use at trial of the partial summary judgment demonstrated that its entry was pointless. We do not agree. The entry of partial summary judgment with respect to Lockheed's liability for diagnostic examinations was a necessary predicate to the entry of the preliminary injunctive relief here. Lockheed contends that for various reasons such relief is impermissible. It is to those contentions that we now turn.

### III

#### A

Lockheed claims that even if partial summary judgment was appropriate, the entry of a preliminary mandatory injunction, ordering it to pay $450,000 into the Registry of the District Court, was improper. Lockheed argues that it is always impermissible for a court to provide interim equitable relief in a suit the ultimate objective of which is the recovery of money damages— the classic remedy at law.[18] Lockheed invokes no less an authority than Learned Hand as the *fons et origo* of this doctrine. In *Sims v. Stuart*, 291 F. 707 (S.D.N.Y. 1922), Judge Hand displayed no hesitation in rejecting the plaintiff's motion for a

---

**18.** In evaluating whether the preliminary injunction here is permissible, it is not clear whether the court should look solely to the law of the District of Columbia, the forum for this diversity suit, or whether it is able to draw on the independent equity power inherent in the federal courts. Some federal courts have held that state law should govern the scope of equitable remedies in a diversity suit when these remedies are so bound up with the substantive rights of the party that an independent federal equitable remedy would interfere with the goals of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). *See e.g., System Operations, Inc. v. Scientific Games Devel. Corp.*, 555 F.2d 1131, 1143 (3d Cir.1977) (stating that state law governs the issue whether special damages need be shown in order to obtain injunction against product disparagement in a diversity case). Commentators have generally ap-proved of this approach. *See generally* 19 C. WRIGHT, A. MILLER & E. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4513 (1982). Other federal courts, however, have invoked the venerable "equitable-remedial-rights" doctrine to conclude that local law does not circumscribe a federal court's equitable powers even when state law supplies the rule of decision. *See, e.g., Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800, 806 (2d Cir.1981). Since no District of Columbia decisional law is on point here, we must make a predictive judgment about D.C. law. It is our view that District of Columbia courts would address the question whether the injunction is permissible under general principles and precedent which inform the judiciary's equitable powers. We therefore need not resolve the *Erie* issue as to the question of the propriety of equitable relief.

mandatory injunction ordering a collector of customs in advance of trial to return money that the plaintiff contended had illegally been seized. Judge Hand stated:

> The acts charged constitute, on the plaintiff's theory, a conversion, nothing more. Under the guise of a mandatory injunction I do not see how I can give final relief in advance of answer and trial in such a case. It is, of course, true that equity will at times affirmatively restore the status quo ante pending the suit. But never, so far as I know, will it take jurisdiction over a legal claim merely to hurry it along by granting final relief at the outset of a cause .... I cannot suppose that it would anywhere be seriously contended that upon a conversion of money the victim might file a bill in equity and get final relief by mandatory injunction.

291 F. at 707–08 (citations omitted).

Judge Hand's remarks have enjoyed wide and lasting currency. In *Enercons Virginia, Inc. v. American Security Bank, N.A.*, 720 F.2d 28 (D.C.Cir.1983), this court recently had occasion to quote *Sims* in reversing a temporary restraining order enjoining a bank from refusing to honor a cashier's check payable to the plaintiff. The *Enercons* court emphasized that since the plaintiff's action was a "straightforward action on a negotiable instrument," the plaintiff possessed an adequate remedy at law and the injunction was impermissible. *Id.* at 29. *See also In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1144–45 (3d Cir.1982) (reversing the District Court's injunction ordering the defendant franchisee to pay back royalties to the franchisor, which was on verge of bankruptcy; the "short answer" to the franchisor's claim for injunctive relief "was provided some sixty years ago by Judge Learned Hand"); *Schlosser v. Commonwealth Edison Co.*, 250 F.2d 478, 481 (7th Cir.), *cert. denied*, 357 U.S. 906, 78 S.Ct. 1150, 2 L.Ed.2d 1156 (1958) (affirming the District Court's refusal to grant a preliminary injunction ordering an employer to pay a retirement annuity to his former employee who alleged that he would suffer irreparable injury without interim relief).

We have no quarrel whatever with *Sims'* result. But, critically, the *Sims* line of cases differs from the instant case in one vital respect: in those cases liability had not yet been determined, whereas here the defendant has already been adjudicated as *liable* for the costs of reasonable diagnostic testing. Only the computation of the *amount* of damages remains for the trier of fact. In our view, the *Sims* rule should not rigidly be erected as an absolute bar to a limited intervention by equity designed to prevent irreparable harm in those circumstances where, as here, the defendant's liability has already been determined through stipulation or partial summary judgment prior to trial. The invocation of equity in such a case reflects a common-sense notion of fairness that undergirds equity jurisprudence: it is more just that a defendant already adjudged liable bear the risk that an interim computation of damages will be fixed too high by the court than to have the plaintiff bear the risk of receiving damages too late to be of any use.[19]

To be sure, the language of *Sims* and other cases cited by Lockheed seems to announce flatly that courts should not entertain interim equitable relief when a remedy at law—money damages—is deemed adequate to provide final relief in the plaintiff's action. In short, equity is perceived in these cases as an interloper threatening to trample law's well-cultivated garden.[20]

---

**19.** Here the District Court through its creative use of a voucher system, *see supra* p. 823, has properly minimized the risk that Lockheed will be forced to pay out more before trial than the trier of fact might award at trial. The court's duty to minimize this risk stems from the traditional and salutary equitable principles that injunctions *pendente lite* should be framed in such a manner that avoids unnecessary hardship to the defendant.

**20.** The clear bifurcation between law and equity that seems to underlie Judge Hand's statement in *Sims* may stem from the procedural division between the two at the time *Sims* was decided. Since 1935, of course, law and equity have been

We cannot agree, however, that equity should never, under any circumstances, be permitted to provide interim relief in an action at law. While our legal system quite properly views damages ultimately as an adequate compensation for a particular kind of loss, it simply does not follow that equity may never be properly called upon, in order to prevent irreparable injury, to accelerate recovery of a portion of damages likely to be awarded when liability has already been determined. Lockheed's counsel commendably admitted at oral argument that once summary judgment was granted, the only circumstance preventing the award of damages for diagnostic examinations was the need to conduct individual trials for the approximately forty French plaintiffs on the issue of the reasonable cost for such examinations. The inability of normal legal channels to provide plaintiffs the necessary relief to prevent their suffering irreparable harm provides under these circumstances the classic case warranting the chancellor's intervention.[21]

Moreover, in the circumstances of this case, we believe that a slavish adherence to *Sims'* dictum would be inconsistent with the deep-rooted power of equity to do what is necessary and appropriate to achieve jus-

tice in the individual case.[22] Other courts have refused to forbid rigidly the entry of preliminary injunctions that create monetary funds, the proceeds of which are to be used to prevent injury. For instance, in *United States v. Price*, 688 F.2d 204 (3d Cir.1982), the District Court had refused to grant a preliminary injunction which would have ordered a company to provide funds for a diagnostic study of the environmental hazards to the Atlantic City water supply created by the company's landfill, because interim equitable relief that granted monetary damages was in its view inappropriate. The Third Circuit affirmed the District Court's denial of preliminary relief, but rejected its rationale. The court noted that funds for a diagnostic study were not a traditional form of compensatory damages but rather a "first step in [a] remedial process" designed to prevent serious irreparable injury.[23] *Id.* at 212. Similarly in the instant case, the funds for diagnostic examinations do not simply represent compensation for past injury, but are required to prevent future injury. To allow this injunction to stand therefore creates no new equitable principle.

We also have no hesitation in rejecting Lockheed's argument that such preliminary

---

united into a single form of action. *See* FED.R. CIV. P. 2.

**21.** Moreover, since Judge Hand explicitly acknowledged that an injunction may be issued to preserve the status quo, his dictum in *Sims* depends on the presupposition that the status quo in actions at law will stay unchanged until a trial takes place. However, as then-Judge William Howard Taft realized, the status quo may not be the kind of "condition of rest" which would justify a court's refusal to act. He stated:

> The office of a preliminary injunction is to preserve the status quo until, upon final hearing, the court may grant full relief. Generally this can be accomplished by an injunction prohibitory in form, but it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant.... In such a case courts of equity issue mandatory writs before the case is heard on its merits.

*Toledo, A.A. & N.M. Ry. Co. v. Pennsylvania Co.,* 54 F. 730, 741 (C.C.N.D. Ohio 1893). In this case, if the District Court's finding that plaintiffs will suffer irreparable injury without diagnostic

examinations is correct, it is clear that the status quo here is a "condition of action."

**22.** The flexibility of equity is aptly stated in *Hecht Co. v. Bowles*, 321 U.S. 321, 329, 64 S.Ct. 587, 591, 88 L.Ed. 754 (1944):

> The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it. The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs ....

**23.** Defendant tries to distinguish *United States v. Price* by emphasizing that the Government was bringing suit under a federal statute which, the court stated, "enhanced the court's traditional equitable power." 688 F.2d at 211. *See* Appellant's Reply Brief at 9. The Third Circuit, however, conceptually justified a preliminary injunction ordering the funding of a diagnostic study based on traditional equitable powers, *see id.* at 212–13, before turning to consider the equitable relief powers conferred by statute.

mandatory injunctions inevitably violate the letter and spirit of Fed.R.Civ. P. 62(a).[24] Rule 62(a) entitles a defendant to a stay of a money judgment pending appeal upon the posting of a supersedeas bond. The rule, however, expressly excepts from its ambit interim and final injunctions and is thus inapplicable to grants of equitable relief.

Lockheed nevertheless contends that even if the letter of the rule does not bar the injunction, the spirit of the rule suggests that money damages are not to be paid over before the case is completed. Despite its facial appeal, this argument, on careful analysis, begs the question: since the policies behind Rule 62(a) are applicable only to remedies at law, Rule 62(a) simply does not represent an implicit policy statement on how and when equity should intervene to prevent irreparable injury.

■ Finally, appropriate to the novelty of the case before us, we emphasize the narrowness of today's holding. [We hold only that a preliminary injunction requiring the defendant to create a fund to pay for diagnostic exams is proper when the defendant has been held liable for the cost of such examinations and when the delay inherent in trying the case to compute the amount of the defendant's liability will result in irreparable injury. Moreover, under our holding, plaintiffs must show that they meet the traditional standards governing the award of equitable relief, and the District Court must seek to minimize the prospect that a plaintiff will receive any funds that a trier of fact will subsequently fail to award.

### B

#### 1

■ Lockheed also argues that the entry of preliminary relief violates its constitu-tional rights to due process and jury trial. Before turning to the specifics of these claims, it should be emphasized that the preliminary injunction here does not purport finally to adjudicate the amount of Lockheed's liability. The ultimate determination of that amount will be made, barring settlement, at a jury trial, where Lockheed will be armed with the full panoply of procedural rights.

Relying on *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1971), Lockheed nevertheless contends that the interim injunction deprives it of property without due process of law. *Fuentes v. Shevin*, of course, held that the Due Process Clause prohibited a private party from seizing another's goods through a prejudgment writ of replevin, which was obtained through a summary process of *ex parte* application to a court clerk. The Court held that the Due Process Clause requires that the party whose goods were to be seized be provided with notice and an opportunity to be heard.

We are frankly nonplussed by Lockheed's reliance on *Fuentes*. Lockheed, of course, had notice of plaintiffs' motion for *pendente lite* relief. Before entering the preliminary injunction, the District Court held twelve days of hearings filling thousands of pages of transcript with testimony from both plaintiffs' and defendant's experts. A full hearing before an Article III judge obviously bears no resemblance whatever to the summary, *ex parte* procedures that the Court found constitutionally deficient in *Fuentes*.

Lockheed nevertheless seems to contend that its due process rights were violated because insufficient evidence was adduced

---

**24.** FED.R.CIV. P. 62(a) provides:

(a) Automatic Stay; Exceptions—Injunctions, Receiverships, and Patent Accountings. Except as stated herein, no execution shall issue upon a judgment nor shall proceedings be taken for its enforcement until the expiration of 10 days after its entry. Unless otherwise ordered by the court, *an interlocutory or final judgment in an action for an injunction* or in a receivership action, or a judgment or order directing an accounting in an action for infringement of letters patent, *shall not be stayed during the period after its entry and until an appeal is taken or during the pendency of an appeal.* The provisions of subdivision (c) of this rule govern the suspending, modifying, restoring, or granting of an injunction during the pendency of an appeal. (Emphasis added.)

to show that each individual plaintiff would suffer irreparable injury in the absence of the contemplated diagnostic examinations. Appellant's Brief at 34. At bottom, Lockheed's claim is simply that one of the traditional predicates for preliminary relief has not been proven. We will examine this contention more fully in part IV, when we assess whether the standard for preliminary relief has been met. However, unless we are to embrace the extraordinary view that every instance in which a district judge grants a preliminary injunction with an insufficient evidentiary predicate works a violation of the Due Process Clause, we must, and we do, reject Lockheed's argument.[25]

### 2

■ Lockheed also claims that the injunction ordering it to pay for diagnostic examinations prior to trial violates the Seventh Amendment. In Lockheed's view, under the Seventh Amendment's strictures only a jury may determine the amount of appellant's liability for those examinations. The short answer to this argument, however, is that, barring settlement, a jury will in fact ultimately determine the amount Lockheed is obligated to compensate the plaintiffs for those examinations. The preliminary injunction simply creates a fund from which plaintiffs can draw to pay for diagnostic examinations before trial.[26]

■ It is manifest that the right to jury trial does not preclude the entry of interim equitable relief designed to prevent irreparable injury. For instance, in *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), the Supreme Court refused to disturb a trial court's preliminary injunction. In that case, the plaintiff sought (1) an accounting of amounts the defendant had earned through the use of its trademark, and (2) a preliminary injunction to restrain the defendant from the use of the trademark *pendente lite*. The defendant made a timely demand for a jury trial, but the trial judge granted the plaintiff's motion for a preliminary injunction and struck the defendant's demand for a jury trial. The Supreme Court reversed the District Court's order striking the defendant's jury-trial demand on the factual issues with respect to the plaintiff's damages claim for breach of trademark. Critically for our purposes, however, the Court left standing the lower court's order granting a preliminary injunction. Justice Black, albeit keenly sensitive in his judicial career to the central role the jury plays in our legal system, stated in writing for the Court that "[the right to jury trial] does not, of course, interfere with the District Court's power to grant temporary relief pending a final adjudication of the merits." 369 U.S. at 479 n. 20, 82 S.Ct. at 901 n. 20.[27] We thus have no hesitation in rejecting Lockheed's Seventh Amendment claim.

### C

### 1

■ Lockheed also argues that the preliminary injunction violates the September 14, 1979 supplemental stipulation entered into by the parties. Lockheed seems to contend that since that stipulation provided each plaintiff $5,000 before trial for pur-

---

**25.** Moreover, Lockheed will in fact have an opportunity to challenge an individual plaintiff's right to funds before distribution. We have previously detailed the safeguards the District Court has imposed in this respect. *See supra* p. 823. Lockheed finds these safeguards insufficient because no opportunity for discovery exists. Lockheed, however, cites no authority for the extraordinary proposition that discovery is a necessary element of due process in a proceeding designed to provide interim relief.

**26.** Presumably, the amount which a plaintiff draws from the fund will be deducted from the jury's verdict. If the jury awards less than the total amount a plaintiff has withdrawn from the fund and received pursuant to the 1979 stipulations, the plaintiff will, of course, be obligated to pay Lockheed the difference.

**27.** To be sure, Justice Black stated that the District Court's grant of temporary relief was "no part of the issues before this Court." 369 U.S. at 479 n. 20, 82 S.Ct. at 901 n. 20. However, we read Justice Black's statement, quoted in the text above, as at the least powerful *dicta* that the Seventh Amendment does not interfere with the judiciary's traditional power to enter injunctions *pendente lite*.

poses that included "medical treatment," the stipulation precludes the plaintiffs' now seeking any additional funds for medical examinations prior to trial.

We do not believe that Lockheed's interpretation represents a fair reading of the stipulation. The relevant portion of the stipulation provides:

> In order to provide such things as medical treatment, therapy, tutoring or child care prior to trial for any injured child requiring such treatment or care, and in order to provide and pay the infant plaintiffs' litigation expenses in this action, including but not limited to medical evaluations, expert witnesses expenses, transportation costs, meals, lodging, translators, court reporters, and depositions, the defendant Lockheed shall, within 20 days after the filing of an amended complaint as to such child, as provided in paragraph one of the attached companion stipulation, pay to the guardian *ad litem* an amount equal to $5,000.00 for that child on a case-by-case basis to be credited against any subsequent judgment or settlement in that case. The application of these amounts for the above purposes shall be at the discretion of the guardian *ad litem* who shall account for the receipt and use of these funds to the Court on a quarterly basis.

Supplemental Stipulation of Sept. 14, 1979, No. 2, J.A. 80.

The language of the stipulation does not expressly place limits on the equitable remedies plaintiffs may seek, nor does it announce that plaintiffs may not receive more than $5,000 each from Lockheed before trial if legal grounds support such interim funding. Lockheed's counsel was well aware of the method by which the defendant could be relieved entirely of a specific kind of liability. Another stipulation entered into by the parties expressly provided that plaintiffs could not seek punitive damages against Lockheed. In view of the absence of similar language specifically preventing plaintiffs from seeking a mandatory preliminary injunction, we decline to hold that plaintiffs signed away one of their legal rights.[28]

Moreover, the action of Lockheed itself suggests that it did not understand the stipulations to preclude the relief entered here. When plaintiffs first moved for partial summary judgment and a mandatory injunction *pendente lite*, Lockheed entered into a tentative settlement in which it agreed to provide funds for diagnostic examinations and medical treatment pending trial. This agreement, however, was vetoed by the Government. Lockheed's willingness to pay out such additional funds suggests that it did not regard the $5,000 payment pursuant to the 1979 stipulations as an absolute limit to what a plaintiff could receive from pretrial remedies nowhere mentioned in those stipulations.

Finally, the stipulations here were based upon the central assumption that they would promote swift settlement of all cases. The guardian *ad litem* thereafter exercised his discretion to employ the Lockheed-provided funds to prepare for the "bellwether" trials expressly contemplated by the stipulations. The assumption that these trials would facilitate settlement has unfortunately proved erroneous. We thus hesitate to embrace Lockheed's interpretation where, as here, material assumptions presupposed by the stipulations lost their validity long ago.

2

■ Lockheed also contends that the preliminary injunction violates the rule against shifting costs to one's adversary in litigation. Lockheed extracts this "rule" from *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). In the *Eisen* litigation, the District Court, recognizing that paying the costs of

---

**28.** We also note that Lockheed's argument throughout its brief that the preliminary injunction here is unprecedented does not square with its argument that this stipulation was understood by the parties to bar such relief. Insofar as the District Court's relief was unprecedented, the drafters of the stipulation would presumably not have taken account of its possibility in framing the stipulation.

notice to the entire class was beyond the means of the solitary class representative, held a preliminary hearing on the merits of the suit. Determining that the plaintiff in that case was likely to prevail, the lower court assessed the defendant ninety percent of the cost of notice to the class.

The Second Circuit reversed the District Court's order, and the Supreme Court affirmed. The Court held that Fed.R.Civ. P. 23 conferred no authority on the District Court "to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* at 177, 94 S.Ct. at 2152. The Court concluded that "[t]he usual rule is that a plaintiff must initially bear the cost of notice to the class." *Id.* at 178, 94 S.Ct. at 2153.

To state the holding of *Eisen* is to show how manifestly inapposite it is to this case. Here, the District Court was not abusing its powers under the Federal Rules of Civil Procedure, but was properly employing its inherent equitable powers. *See supra* II. The District Court's order, like any preliminary injunction, was intended to prevent plaintiffs from suffering irreparable injury. Its purpose therefore was not, as in *Eisen*, to shift the costs of the action to the defendant.[29] While the order might have the incidental effect of aiding plaintiffs in their prosecution of the case, *Eisen* clearly does not stand for the proposition that interim

equitable relief which is otherwise proper should not be granted if its effect is to assist the plaintiffs in prosecuting their litigation. Indeed, only a principle that it is more important to ensure that parties bear their own costs than to prevent irreparable injury would support the "rule" Lockheed suggests. That principle, of course, would be squarely at odds with the whole purpose of equitable relief.[30]

## IV

Lockheed also contends that the injunction fails to satisfy the traditional criteria governing the issuance of injunctive relief. These criteria are, of course, well-established. The plaintiffs must demonstrate that, on balance, the consideration of four factors—plaintiffs' potential irreparable injury, plaintiffs' likelihood of success on the merits, the balance of hardships between plaintiffs and defendant, and the public interest—favors granting an injunction. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc., supra,* 559 F.2d at 841. The District Court canvassed these factors and concluded that all four favored the issuance of interim relief. Lockheed on appeal vigorously contends that no factor favors such relief.

 Our review of the District Court's issuance of this injunction is narrow.[31] "It is well settled that whether a

---

**29.** At the preliminary injunction hearings, the District Court occasionally seemed to assume that a principal purpose of the order was to aid the court in adjudication of the claim. *See, e.g.,* Transcript of Hearing on Plaintiffs' Motion for Summary Judgment and a Preliminary Injunction at 1470 [hereinafter "Tr."]. The District Court's memorandum opinion, however, correctly reflects the understanding that irreparable injury is the necessary predicate of the *pendente lite* relief granted here. We do not therefore view a few isolated remarks at the hearings as warranting reversal of an order amply and accurately supported by the memorandum opinion.

**30.** In this regard, Lockheed seems particularly offended by the fact that the court has not precluded the plaintiffs from choosing their own physicians for diagnostic examinations. These physicians may then testify on plaintiffs' behalf at trial. The plaintiffs' prerogative to

choose their own physicians for diagnostic examinations, however, stems not from this preliminary injunction, but from the nature of the physician-patient relationship which is recognized in such legal principles as the physician-patient evidentiary privilege.

**31.** Lockheed argues that a plaintiff seeking a mandatory preliminary injunction must make a stronger showing than one seeking a prohibitory injunction. *See, e.g., Jacobson & Co. v. Armstrong Cork Co.,* 548 F.2d 438, 441 (2d Cir.1977) (stating that granting a mandatory injunction requires plaintiff to demonstrate "extreme or very serious damage"). In this circuit, however, no case seems to squarely require a heightened showing, and we express no view as to whether a heightened showing should in fact be required. However, we believe that, assuming its applicability, the higher standard is fully met here because of the District Court's finding that

preliminary injunction should be awarded rests in the sound discretion of the trial court." *See Ambach v. Bell,* 686 F.2d 974, 979 (D.C.Cir.1982). This court will ordinarily not reverse a District Court's order for interim relief except in cases of abuse of discretion or clear error.[32] *Id.* Under this standard, we consider each of Lockheed's objections to the District Court's findings.

### A

#### 1

First, Lockheed contends that plaintiffs have not sufficiently demonstrated that each child needs a diagnostic examination. To the contrary, Lockheed argues that the evidence suggests that most French plaintiffs in fact do not need further examinations. Lockheed emphasizes in this respect that the District Court conceded that "it may well be that many of the foreign infant plaintiffs will need no further examination." Mem. Op. II at 18, J.A. 23.

 We believe, however, that the evidence sufficiently supports the plaintiffs'

present need for diagnostic examinations for MBD to warrant a finding of irreparable injury. We emphasize that in the context of the preliminary injunction here the District Court was simply not in a position to assess the medical history of each plaintiff to determine whether past examinations were sufficient.[33] Instead, the District Court properly inferred from the available evidence that plaintiffs were likely to need diagnostic examinations for MBD. Although, as the District Court noted, some plaintiffs may already have had sufficient examinations, the voucher system established by the court helps ensure that those plaintiffs who have already been properly examined will not be given the benefit of the court-mandated interim relief.[34]

An expert in French medicine testified for plaintiffs that MBD was not recognized by most practitioners in France and that a centralized system of referral to appropriate well-recognized institutions was necessary for treatment.[35] Lockheed's expert

---

the children here face potentially severe and irreversible medical danger unless they immediately obtain diagnostic tests.

**32.** Our standard of review of a preliminary injunction does allow "a greater amplitude of review" when a substantial issue of the District Court's correctness as to questions of law is raised. *See NRDC v. Morton,* 458 F.2d 827, 832 (D.C.Cir.1972) (Leventhal, J.). Thus, we undertook an essentially *de novo* review in analyzing Lockheed's contention that this injunction violated the *Sims* rule, *see supra* III A, and abridged the defendant's rights to due process and a jury trial, *see supra* III B. Findings of fact, of course, are reviewed under the clearly-erroneous standard, which is the usual standard on appeal even from a final order. The nature of the discretion peculiar to the preliminary injunction lies in the latitude given to the District Court to engage in a balancing of the traditional factors and to determine what evidence can properly be adduced in the limited time that can be devoted to a preliminary injunction hearing. This latter aspect of the District Court's discretion is important in the particular circumstances of this case. The individual plaintiffs here are approximately 40 French nationals, living in France. The District Court therefore properly declined to require all the plaintiffs to testify individually as to irreparable injury, but instead drew inferences from evidence that was

readily available in the context of this preliminary injunction hearing.

**33.** For a discussion of the District Court's discretion to draw inferences from the evidence reasonably available at the time of the hearing on the preliminary injunction, see *supra* note 32.

**34.** Moreover, the District Court stated that doctors would review the children's records before determining what, if any, diagnostic examinations would be needed. *See* Mem.Op. I at 16, J.A. 52.

**35.** In a letter submitted to the District Court, Dr. Dugas stated his view of the present level of French understanding of "organic brain dysfunction":

It is my experience that the treatment for organic brain dysfunction and its sequelae is not fully appreciated by most medical institutions and practitioners within the European continent, most specifically France, and that if treatment is to be provided for these children, a centralized approach of referrals of the parents and their children to appropriate well-recognized medical, pedagogical and psychological institutions should be provided to the parents of these children.

Letter of Dr. Dugas to Charles Work (March 5, 1984), *quoted in* Appellees' Brief at 38–39.

agreed that the concept of MBD was not generally recognized in France to the same degree as in the United States.[36] In view of the lack of recognition of MBD among ordinary practitioners in France, the District Court could properly conclude that it was unlikely that plaintiffs had heretofore received a proper diagnostic examination. There is simply no evidence to suggest that most of these children had examinations from physicians skilled in diagnosing MBD. Indeed, one of defendant's experts conceded that even in the United States a limited number of such doctors are available.[37] Under these circumstances, we decline to overturn the District Court's finding that these children need diagnostic examinations straightaway.

2

 Lockheed also contends that no finding of irreparable injury is proper because plaintiffs can afford to pay for the examinations themselves. The District Court, however, justifiably concluded otherwise. In discussing the amount of bond plaintiffs were to post, the court stated that plaintiffs did not have "such extensive resources" as to afford either examinations or a bond covering their cost. Mem.Op. II at 27, J.A. 32. This finding is not "clearly erroneous." It is supported in the record by the sworn statements of Charles Work, the guardian *ad litem*. Mr. Work met with a number of families which adopted the Vietnamese orphans and submitted an affidavit stating that the infants would not receive "medical services" unless the District Court set up a fund to pay for such services. Affidavit of Charles Work (undated), J.A. 152–53.

Nevertheless, Lockheed argues that plaintiffs can afford a comprehensive diagnostic examination for MBD because one of plaintiffs' experts, Dr. Gittleman-Klein, assessed the cost of the needed diagnostic examinations by a pediatrician, a clinical psychologist, a psychiatrist, and a neurologist at a range from $250–$1,000. Transcript of Plaintiffs' Motion for Summary Judgment and a Preliminary Injunction at 884 [hereinafter "Tr."]. However, in view of the testimony that most practitioners in France do not even recognize the concept of MBD, it is extremely doubtful that a comprehensive diagnostic examination for MBD may be obtained through visits to ordinary pediatricians, psychologists, psychiatrists and neurologists. In fact, Dr. Gittleman-Klein testified that a "complete work-up" could cost as much as $5,000. *Id.*

Moreover, the District Court could quite properly conclude that medical expenses running into thousands of dollars would likely constitute a formidable obstacle to families of moderate means. Although Friends For All Children screened the adoptive parents for financial capability, that screening was obviously not designed to ensure that children would all be adopted by Croesuses, able and willing to bear extraordinary medical expenses for subtle diseases such as MBD.[38] We therefore do not believe that the facts presented by Lockheed justify a ruling that the District Court's finding was clearly erroneous.[39]

---

**36.** Dr. Messerschmitt, defendant's expert, testified on cross examination:

Q. Doctor, is it fair to say that the concept of M.B.D., as defined by the mainstream American pediatric thought, including pediatric neurologists, is not widely accepted in France?
A. Absolutely.
Tr. at 1663.

**37.** *See* Affidavit of Dr. Stevens (Sept. 14, 1979), J.A. 143 (stating that in order to conduct an examination of the plaintiffs, it would be "necessary to retain the services of very specialized experts, of whom there are not a great number available").

**38.** An undated memorandum from Friends For All Children suggests that parents were also screened for health insurance. Memorandum from Friends For All Children, J.A. 95–96. However, no other shred of evidence supports the contention that the French parents were screened for health insurance. In view of the fact that France has a public health system which pays for most medical examinations, French parents would seem considerably less likely to have independent health insurance.

**39.** Lockheed also argues that 15 families of the French plaintiffs should have testified at the preliminary hearing as to their financial capabilities. We think that the court properly exercised its discretion in making its factual finding

### 3

Lockheed argues that even if the plaintiffs themselves are incapable of paying for MBD diagnostic examinations, the French public health service will cover the cost. The District Court, however, expressly found that France, as opposed to other European countries, was not likely to provide appropriate diagnostic examinations. Mem.Op. II at 18, J.A. 23.

Once again, this finding of the District Court is not clearly erroneous. It is supported by one of plaintiffs' medical experts, who specifically testified that such diagnostic services are not readily available in that country. *See, e.g.,* Tr. at 852–57, 868–73 (Testimony of Dr. Gittleman-Klein). Moreover, from the overwhelming testimony that MBD is not even recognized by most practitioners in France, it is permissible to infer that most plaintiffs would have to travel outside their own locales to obtain the services of the few available experts. Plaintiffs' French law expert furnished an affidavit stating that France's social security system does not cover the costs of medical diagnosis and treatment provided by a physician chosen by the patient "outside his town of residence, or the next town." Affidavit of Antoine A. d'Orano (Dec. 30, 1983), J.A. 210. Finally, the District Court's finding is supported by the fact that few, if any, of the French children have received comprehensive neurological examinations through that country's public health care system.[40] *See* Mem.Op. II at 19, J.A. 24.

### B

Having disposed of Lockheed's claim that the District Court improperly found irreparable injury, we have no difficulty in concluding that the other factors in the preliminary injunction calculus favor granting relief. Lockheed contends that plaintiffs have not shown a likelihood of success on the merits, but we agree with the District Court that plaintiffs are likely ultimately to recover at least the amount they have withdrawn from the fund established by the injunction. In the previous trials involving the American plaintiffs, Lockheed has not won a single verdict which has been upheld. Moreover, each American plaintiff received substantial compensation when a settlement was finally reached.

Nor does Lockheed's argument that the balance of hardships militates in its favor fare any better. Lockheed is receiving interest on the funds that it has been ordered to deposit. The only potential hardship to which Lockheed can point is the loss of funds that may be paid out to

---

as to irreparable injury on evidence that was readily available. In the context of a preliminary injunction, it is clearly futile to require evidence that may be obtained at a cost that may approximate or exceed the measure of relief sought. *See supra* note 32.

**40.** Lockheed also contends that the plaintiffs brought irreparable injury on themselves because of the guardian *ad litem's* decision to use the funds received by operation of the stipulation for litigation rather than medical expenses. We believe, however, that the guardian *ad litem* reasonably exercised his discretion under the stipulation to use the money to prepare for the bellwether trials which were widely anticipated as heralding a global settlement. After the bellwether trials ended in 1980, the guardian *ad litem* reasonably used funds received through the stipulation to contest Lockheed's *forum non conveniens* motion designed to prevent the for-

eign plaintiffs from litigating at all in the courts of the District of Columbia.

Lockheed also argues that the plaintiffs should not be heard to complain of delay, because their request that Judge Oberdorfer try all the individual cases is the real cause of the judicial congestion that threatens irreparable injury. However, even if the individual trials were dispersed among all the judges of the District Court, ultimate relief for these plaintiffs would likely be some time away. *See Friends For All Children v. Lockheed Aircraft, supra,* 87 F.R.D. at 564. This is true even with the recent development, since the time of the District Court's entry of the preliminary injunction, of several cases being assigned to other District Judges, with trial dates likely to be set in the remaining months of 1984. But trial dates for the remaining thirty-four plaintiffs are as yet not in sight.

plaintiffs who ·fail at their subsequent trials to win a sufficient amount of compensation.[41] By virtue of the safeguards inherent in the "voucher" system, however, it is likely that any such loss will be relatively small. Thus, fairly viewed, Lockheed's potential injury pales in comparison to the potentially deteriorating condition that these children face in the absence of prompt diagnostic examinations.[42]

Finally, Lockheed contends that the public interest does not favor injunctive relief, because the availability of preliminary monetary relief will lead plaintiffs to choose this circuit as a forum, thereby disrupting the orderly administration of justice in this jurisdiction. Because our affirmance of the injunctive relief awarded here is rooted in traditional equitable principles, we believe that other courts would award similar equitable relief when faced with a situation comparable to the peculiar circumstances of this case. No incentive for forum shopping will thus be created. Moreover, it is clear that diagnostic examinations will provide information that will hopefully facilitate settlement and thereby relieve the un-

usual congestion created by this massive litigation. No one can doubt that ending in a prompt and just manner this eight-year-old litigation will substantially aid the administration of justice in the federal courts of this District. The issuance of the injunction is thus clearly in the public interest.

## V

Having concluded that the traditional factors favor the granting of equitable relief, we affirm the judgment of the District Court.[43]

*Affirmed.*

---

**41.** Lockheed also argues that the entry of the preliminary injunction will prejudice its case in subsequent trials. We have already dealt with this contention, *see supra* II C.

**42.** Lockheed contends that the District Court erred in requiring plaintiffs to post a bond of only $100. It is well settled, however, that the amount required as security for an injunction is a matter entrusted to the sound discretion of the trial court. *See, e.g., Corrigan Dispatch Co. v. Casa Guzman, S.A.,* 569 F.2d 300, 302–03 (5th Cir.1978). We do not believe the court abused its discretion at this stage of the process of preliminary relief which the court has established. The $450,000 amount mandated by the injunction has been deposited in an interest bearing account. Funds are to be disbursed only after the guardian *ad litem* has submitted a voucher and Lockheed has had an opportunity to respond. At the time of any such response, Lockheed can request that the bond be increased when Lockheed has a "particular *bona fide* objection." *See* Mem.Op. I at 17, J.A. 53.

**43.** While we have no hesitation in affirming the District Court's issuance of an injunction ordering Lockheed to create a fund to pay for preliminary examinations, we are less certain that the

District Court was correct in its determination of the amount required for the fund. The $450,-000 amount presently required represents over $10,000 for every plaintiff whom the District Court has determined to be eligible for payments from the fund. The District Court, however, implies in its opinion that $5,000 should be sufficient to provide a plaintiff with a diagnostic examination. *See* Mem.Op. II at 20, J.A. 25 (stating that plaintiffs who have recently received $5,000 through operation of the 1979 stipulation "can reasonably be expected to receive appropriate diagnostic treatment in absence of action by the Court").

In view of the complex testimony adduced at the preliminary hearing, the amount needed to cover diagnostic examinations is in the sound discretion of the trial court. Moreover, by requiring funds to be placed in an interest bearing account the District Court, as we have previously observed, has minimized the injury to Lockheed that may be caused by the deposit of excess funds. Still, in view of the apparent discrepancy in the determination of the amount required, the District Court may elect to reconsider the amount Lockheed has been required to deposit in the Registry of the District Court to conform more closely with likely or possible disbursements from the fund.